482 A.2d 17

**Marguerite MARECK**

v.

**The JOHNS HOPKINS UNIVERSITY, et al.**

**No. 1717, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

Oct. 8, 1984.

Certiorari Denied Feb. 5, 1985.

Barry C. Steel, Monkton, with whom were Iannacone & Steel, P.A., Monkton, on the brief, for appellant.

Frank J. Vecella, Baltimore, with whom were Anderson, Coe & King, Baltimore, on the brief, for appellees.

Argued before ADKINS and BELL, JJ., and ROBERT L. KARWACKI, Associate Judge of the Eighth Judicial Circuit (now Associate Judge of the Court of Special Appeals), Specially Assigned.

BELL, Judge.

Marguerite Mareck brought suit in the Circuit Court for Baltimore County against Johns Hopkins University, Lewis B. Galambos and others for slander. She dismissed her claim against all but the University and Galambos prior to filing this appeal. The trial judge, presiding over a jury, granted the University's and Galambos' motion for a directed verdict raised at the close of Mareck's case.

The sole issue for our review is whether the trial court erred in granting appellees' motion for a directed verdict at the close of appellant's case on the ground that there was no abuse of a qualified privilege.

For reasons we shall discuss, we reverse.

Mareck was employed by Johns Hopkins University for approximately ten years as the personal secretary to Galambos, who was the editor of the Eisenhower Papers Project at the University. The Project involved the collecting, editing and publishing of the papers of former President and General of the Army, Dwight David Eisenhower. The papers which were collected, edited and published at the Project included personal and government classified documents. Some of these documents carried a top secret classification. All of the staff and the employees at the Project were required to have top secret security clearances.

Mareck was employed at the Project from 1971 until January 20, 1981. Prior to October 17, 1980, in her capacity as personal secretary to Galambos, Mareck did virtually all of the typing at the Project including the typing of classified materials as well as the administrative correspondence for the Project. She handled the petty cash fund. She had her own key to both offices of the Project, accounted for all keys issued to the other staff members, and maintained the security of the spare door keys, the personnel files for the staff, the financial records of the Project, as well as the travel records of the staff. She handled all of the incoming and outgoing mail for the Project. She answered the tele-

phones for the Project. She worked with the materials, including the top secret materials, which were kept in safes. She had possession of a key to the file cabinets containing the administrative correspondence, personnel records, travel records, and financial records of the Project.

Mareck requested a pay raise in the late spring of 1980. Galambos agreed to approve that request in part. Mareck was dissatisfied and informed Galambos that she intended to file a formal grievance with the personnel office at the University. Mareck testified that Galambos told her that she could be fired if she pursued that action. Despite such threats, in July of 1980, Mareck filed a formal grievance with the Personnel Director. In August after the grievance was not resolved to her satisfaction, Mareck filed a complaint with the Department of Labor, Employment Standards Administration. Mareck's complaints against the University were now twofold, that both the pay structure and the grievance mechanism were unfair. Shortly thereafter, appellant took the same grievances to the National Labor Relations Board. Still later, she took her complaints to the Equal Employment Opportunities Commission. During this same period, she joined a group called Baltimore Working Women and aired her grievances over her pay and the University's grievance process at meetings of that group. In July of 1980, a group was formed at the University as an outgrowth of the Baltimore Working Women. This group was called The Johns Hopkins University Employees Association. Mareck joined that group and expressed her complaints at its meetings.

The Hopkins Newsletter published letters from the Association which were critical of the pay and grievance process. Ultimately, Mareck contacted *The Baltimore Sun* with her complaints.

There is no evidence or allegation that Mareck disclosed any confidential or classified information relating to the workings of the Eisenhower Papers Project to any of the agencies, individuals, newspapers or organizations to whom

she had complained. Galambos and Richard Zdanis, the Vice Provost at the University, were fully aware that Mareck was "going public" with her complaints about her pay and the University's grievance procedures.

On or just prior to October 16, 1980, Mareck met with the University's Affirmative Action Officer, Yvonne Theodore, to discuss her dissatisfaction with her pay and the grievance procedures. During the course of that meeting, Mareck told Theodore that she was considering going to *The Washington Post* to seek "publicity for the salary grievance and the lack of grievance procedures at Hopkins." Theodore then went to Vice Provost Zdanis and told him that Mareck had stated that she intended to go to *The Washington Post* to disclose some unspecified information. In her brief conversation with Zdanis, Theodore did not identify the subject matter that Mareck had said she might take to *The Washington Post.* Zdanis then telephoned Galambos and, without identifying his source, simply repeated what he had been told by Theodore. Galambos interpreted Mareck's statement as a hostile threat by Mareck, with a "clear negative thrust."

Galambos then discussed the matter with another staff member at the Project, Elizabeth Hughes, but did not ascertain anything more specific. All Galambos knew at that time was that Zdanis had heard that Mareck was considering communicating with *The Washington Post* and that Hughes knew Mareck was "going public" in some way.

At trial, Galambos testified that he "had no idea" what the subject matter of Mareck's possible communication with *The Washington Post* was and that "It could have been anything." He further stated that, based on the information he had received from Zdanis and Hughes, the subject matter of appellant's possible communication with *The Washington Post* could have been anything "negative" including a report by her to *The Washington Post* that the Hopkins pay policies and grievance system were unfair and inadequate.

Galambos testified that he concluded he could not trust Mareck any longer. Consequently, on the day after talking to Zdanis, Galambos told Daun Van Ee, the Executive Director of the Project, that he was going to make certain changes with respect to Mareck's duties and responsibilities. Galambos claimed that he was doing so because he had lost confidence in her and he was concerned that she might allow an investigative reporter from *The Washington Post* into the Project at night to obtain classified information. Galambos and Van Ee then met with Mr. Rogers, the Personnel Director, and discussed the situation with him.

That same day, October 17, 1980, Galambos called a meeting of the entire staff of the Project. He collected everyone's keys to the doors of the Project's two offices and, a few minutes later, gave the keys back to all but Mareck. He also received Mareck's key to the filing cabinets and her spare door keys. He then reassigned all of her various duties to the other staff members so that she was no longer his personal secretary. Galambos changed her relationship to the top secret materials so that she had access to those materials only when other staff were present. From that time on, Mareck felt she was watched continuously by the other staff members. Mareck no longer typed Galambos' personal correspondence. From that day until she was terminated, about three months later, the bulk of the work Mareck did was indexing microfilm reels, the lowest priority work on the Project.

All of the changes Galambos made in Mareck's duties and responsibilities were permanent except for a two day period approximately one month later when he returned her door key to her but then took it away again. Galambos never inquired of Mareck about the reports he had received that she might possibly contact *The Washington Post* about some unidentified subject, nor did he conduct any further investigation of any kind to identify that subject matter.

Galambos did tell appellant that he had changed her duties and responsibilities because he had lost confidence in

her and that she could no longer be trusted. He also told her that he did not want the same thing to happen that happened when a staff member named Betty Smith left the Project some years before. Galambos explained at trial that Smith had neither communicated to the press nor made improper public disclosures about the Project to anyone when she left her employment at the Project. Instead, Smith had complained to Milton Eisenhower and to a federal agency concerned with security at the Project about alleged mismanagement by Galambos.

According to Mareck from October 17, 1980, until the termination of her employment, she was treated like a criminal and a traitor, watched continuously by the other staff members and was ostracized and shunned by the other staff members.

Mareck did not contact *The Washington Post.* After she left her employment at the Project, she did contact *The Baltimore Sun* about her dissatisfaction with her pay and with the University's grievance procedures, which subjects were later discussed in an article published by that newspaper.

### *Defamation*

 Three elements are required to establish a *prima facie* case of defamation. First, the alleged defamatory statement or action must expose a person to "public scorn, hatred, contempt or ridicule" and thus injure reputation. *Thompson v. Upton,* 218 Md. 433, 437, 146 A.2d 880, 883 (1958). Second, the alleged defamatory publication must be communicated to a third person and that person must reasonably recognize the publication to be defamatory. *Embrey v. Holly,* 48 Md.App. 571, 580, 429 A.2d 251, 258 (1981), affirmed in part, reversed in part, 293 Md. 128, 442 A.2d 996 (1982). Third, damages must be proven. *Id.* at 580–581, 429 A.2d 251.

 If the defamatory statement or action is absolutely privileged, it is protected. In addition, the Court of Appeals

of Maryland has recognized and adopted as a part of the law of defamation, the common law principle that there is a conditional or qualified privilege. That privilege is based on the concept that the speaker or publisher may avoid liability for a statement which would otherwise be defamatory if publication of that utterance advances social policies of "greater importance than the vindication of a plaintiff's reputational interest." *Marchesi v. Franchino*, 283 Md. 131, 135, 387 A.2d 1129 (1978).

The existence of a qualified privilege has been recognized in a number of different situations including: reports of public proceedings; statements of one acting in the public interest; statements made to defend one's own actions, property or reputation; interest of the recipient in securing the information; and statements in the common interest of the publisher and the recipient. Restatement of Torts 2d §§ 593–598 (1977).

The rationale behind protecting the speaker-publisher is that one ought to be protected from liability for defamation where he publishes a statement in good faith in furtherance of (1) interests of his own, *Marchesi v. Franchino*, 283 Md. at 135, 387 A.2d 1129 (speaker's safety); (2) interests shared with others, *Id.* at 135–136, 387 A.2d 1129 (supervisor's responsibility to discharge his department's responsibilities); *See also Hanrahan v. Kelly*, 269 Md. 21, 305 A.2d 151 (1973); Annot., 62 A.L.R.3d 1187 (1975) (where the sender of the letter and the recipients were involved in a common business interest); or (3) interests of those of the general public, *Fitzgerald v. Penthouse International, Ltd.*, 691 F.2d 666 (1982) *cert. denied*, 460 U.S. 1024, 103 S.Ct. 1277, 75 L.Ed.2d 497 (wherein the defamation was of a "limited purpose" public figure).

■ A qualified privilege will exist only if exercised in a reasonable manner and for a proper purpose. Where the foundation for granting the qualified privilege no longer exists, the privilege is lost and the publisher is subjected to liability. This will occur under the following circumstances:

(1) the publication is made with malice, that is, with "knowledge of falsity or reckless disregard for truth . . .", *Marchesi v. Franchino,* 283 Md. at 139, 387 A.2d 1129. Restatement of Torts 2d § 600–602; (2) the statement was not made in furtherance of the interest for which the privilege exists, Restatement of Torts 2d § 603; (3) the statement is made to a third person other than one "whose hearing is reasonably believed to be necessary or useful to the protection of the interest . . .", *General Motors Corp. v. Piskor,* 277 Md. 165, 173, 352 A.2d 810 (1976); Restatement of Torts 2d § 604; and (4) the statement includes defamatory matter not reasonably believed to be in line with the purpose for which the privilege was granted. Restatement of Torts 2d § 605.

### The Directed Verdict

At the close of appellant's case the appellees moved for a directed verdict under Maryland Rule of Procedure 552 § c.[1]

██ In considering a motion for a directed verdict, the trial court must accept as true all credible evidence on the issues and all inferences fairly flowing from that evidence and consider them in the light most favorable to the party against whom the motion is made. If there is any legally relevant competent evidence, no matter how slight, from which a rational mind could infer a fact in issue, then the court would be invading the jury's province by granting a directed verdict. Under those circumstances, the directed verdict should be denied and the case submitted to the jury. *Impala Platinum v. Impala Sales,* 283 Md. 296, 328, 389 A.2d 887 (1978).

██ The trial court granted the motion for a directed verdict. In doing so, the court did decide that there was sufficient evidence to present the issue of whether there

---

1. Revised Rule 2–519 effective July 1, 1984, preserves this procedure. The same standard for disposition of the motion pertains to a jury trial. The motion in both jury and court trials is designated as a Motion for Judgment.

was a defamation to the jury. In addition, the court found that there was a qualified or conditional privilege. The parties do not challenge these findings. Then the court considered whether there was abuse of that privilege. The court held that "reasonable minds could not differ on the issue of whether or not Dr. Galambos acted in reckless disregard of the truth, acted in an abusive manner or acted in a manner which was ill-tempered and motivated by "ill-will." The court went on to conclude that the facts did not seem to indicate "ill-will or reckless disregard," and granted the motion for a directed verdict.

The sole issue we must address is whether there was any legally relevant competent evidence from which a rational mind could infer the fact in issue favorably to Mareck. The court decided that the appellant had presented a *prima facie* case and that there was a qualified privilege. The court deduced, however, that Galambos did not abuse the privilege since there was no evidence that Galambos acted in "reckless disregard of the truth or acted in an abusive or ill tempered manner." Appellant does not contest that Galambos acted under a qualified privilege, but does contend that there was legally relevant competent evidence from which the jury could infer that the qualified privilege was abused and thus lost. There was evidence, if believed, that prior to the alleged defamatory action, appellee Galambos had threatened to fire appellant if she continued her complaints. A significant fact on appellant's behalf was that upon hearing that appellant had mentioned contacting *The Washington Post*, Galambos made no effort to inquire of this employee with almost ten years service what she had in mind in saying she would contact *The Washington Post*. Galambos knew full well that Mareck had complained to many agencies and newspapers and had never breached the security of the project. Yet, as Galambos testified, he had told Daun Van Ee, the Executive Director of the Project, that he was concerned that the appellant might allow an investigative reporter from *The Washington Post* to sneak into the project at night to obtain classified information. If

Galambos feared surreptitious entry into the project through appellant, why did he return the keys to her for several days? In addition, Galambos told Mareck that he was concerned that she might embarrass him as Betty Smith, a former employee, had done by complaining about alleged mismanagement to Milton Eisenhower and to a federal agency concerned with security at the Project. Also, Galambos spoke to Rogers and to Hughes about the allegations and his conclusions. This was evidence from which the jury could have inferred that the actions of Galambos were not a reasonable response to a perceived threat to the security of the Project, but amounted to an abuse.

Whether a defamatory statement is entitled to a qualified privilege is a question of law for the court, but whether that qualified privilege has been abused is generally a question of fact for the jury. *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 600, 350 A.2d 688 (1976).

We hold there was evidence from which a court could have inferred such abuse. We hold, therefore, that the court erred in directing a verdict for appellees.

JUDGMENT REVERSED AND REMANDED FOR A NEW TRIAL.

COSTS TO BE PAID BY APPELLEES.