918 A.2d 526

**MONTGOMERY INVESTIGATIVE SERVICES, LTD. et al.**

v.

**Robert T. HORNE et al.**

**No. 2849 Sept. Term, 2005.**

Court of Special Appeals of Maryland.

March 12, 2007.

194

Robert L. Ferguson, Jr. (Bernard A. Meis, on the brief), Baltimore, MD, for Appellant.

Erica C. Mudd, Rockville, MD and Robert Bonsib, Greenbelt, MD (Jeremy R. Krum, H. Kenneth Armstrong, Rockville, MD, on the brief), for Appellee.

Panel: MURPHY, C.J., HOLLANDER, and CHARLES E. MOYLAN, JR. (retired, specially assigned), JJ.

CHARLES E. MOYLAN, JR., Judge (retired, specially assigned).

The rule is that a defendant may not, without liability, publish defamatory information about a plaintiff. An exception to the rule is that sometimes a defendant enjoys a qualified privilege to publish defamatory information in order to serve some greater need. The exception to that exception is that the qualified privilege may be lost if it is abused. This case involves a couple of exceptions to the exception.

\* \* \*

On April 11, 2003, the appellee and cross-appellant, Robert T. Horne, filed a complaint in the Circuit Court for Montgomery County. The complaint charged defamation[1] against, *inter alia*, three defendants. Two of those defendants are the appellants, Montgomery County Investigative Services, LTD. ("MIS") and Tammy White, an employee of MIS. The third defendant whose case still concerns us is the cross-appellee, AA Southern Services, Inc. ("Southern Services").

Horne's claim against these three defendants was tried before a jury on December 19 through December 22, 2005. At the close of the plaintiff's case, judgment was granted in favor of the defendant Southern Services. Horne's cross-appeal is from that grant of judgment.

A similar motion for judgment by the appellants, MIS and White, was denied both at that time and at the end of the entire case. The jury rendered a verdict in favor of Horne against both appellants. In appealing the judgment against them, the appellants raise the two contentions

1. that the trial judge erroneously failed to grant their motion for judgment on the ground that Horne had failed to produce sufficient evidence of actual malice to overcome their qualified privilege, and

---

1. He also charged the various defendants with both injurious falsehood and false light. These charges were subsequently either dismissed (injurious falsehood) or dropped (false light) and no longer concern us.

2. that the court erroneously instructed the jury on the definition of actual malice.

## The Factual Background

In the Spring of 2002, Southern Services was in the business of providing termite and pest control to residential homeowners. The technicians for Southern Services would frequently have access to private homes at times when the homeowners were not present or at times when only a minor child was present. In order to protect its residential customers and to reduce the risk of harm, Southern Services requested criminal background checks on all of its technicians who would have access to residential homes. The criminal background checks were performed both during the initial hiring process and annually thereafter.

MIS was and is in the business of conducting various types of background checks for its clients. It conducts criminal, civil, traffic, and social security inquiries, as well as hospital record checks. MIS will conduct a simple computerized search through court databases for a fee of $18 per inquiry, and will provide the client with a processed summary along with matching printouts. It will also conduct more thorough investigations, such as going to a courthouse to obtain copies of original documents from the court records. The client is charged a higher hourly rate for the more thorough investigations.

## The Initial Hiring of Horne

In early March of 2002, Horne applied for a job at the Silver Spring office of Southern Services. Horne was interviewed by James Lambert, the manager of the Silver Spring office. Lambert informed Horne that Southern Services would be performing a background check on him.

In the course of that interview, Horne informed Lambert about one brush that he had with the law. He had been arrested and charged with transporting a handgun and with impersonating a police officer. The charge of impersonating

an officer resulted in a verdict of not guilty. In the Circuit Court for Montgomery County, Horne pleaded guilty to the charge of transporting a handgun, and the disposition of the case was probation before judgment, with one year of supervised probation. These charges had all been filed in the District Court on February 28, 1997. The cases were transferred to the Circuit Court and were disposed of by Judge Martha Kavanaugh on May 6, 1997. On March 12, 2002, Lambert hired Horne as a residential, pest-control technician.

### The Criminal Background Check

The routine background check on Horne was initiated on March 29, 2002, by Southern Services' district manager's office located in Manassas, Virginia. The district manager in Manassas was David Clayborn. The person initiating the request for a background check was Penny Clayborn, who also worked at the Manassas office. The request was for both a criminal records check and a civil records check, both for the State of Maryland.

The subject of the requested background check was listed as "Robert Horne," with no middle initial being given. Horne's address was given, however, as well as his social security number and his birthdate of "5–23–73."

### The Background Check Report

This case hinges entirely on the results of that background check as forwarded from MIS to Southern Services on April 2, 2002. When MIS received the request for the background check on March 29, 2002, the request was turned over to the appellant Tammy White, a background investigator for MIS.

The report of April 2, 2002, was faxed from Tammy White of MIS to Penny Clayborn of Southern Services. The report had been prepared by Tammy White. The singular subject of the investigation in that report was designated simply as "Robert Horne."

The bottom of the single page report summary showed an "Investigative Fee" of $54.00, reflecting "3 MD SEARCHES

@ $18.00 EACH." The result of the first of these searches was unremarkable:

```
DISTRICT COURT OF MARYLAND, CRIMINAL
CASE NUMBER:        4D00042046
CHARGE: 1:     DEADLY WEAPON-CONCEAL    DISP: FORWARD TO CC
CHARGE: 2:     HANDGUN ON PERSON        DISP: FORWARD TO CC
CHARGE: 3:     PERSONATE POLICE OFFICER DISP: FORWARD TO CC
```

Although no dates were given, those three charges were the charges filed against Horne in the District Court on February 28, 1997. They were all forwarded to the Circuit Court for ultimate disposition. These were the charges that Horne had described to James Lambert in his job interview.

The result of the second of the three searches was also unremarkable.

## DISTRICT COURT OF MARYLAND, CIVIL SEVERAL RECORDS MATCHING FIRST AND LAST NAME

Simply on the basis of the first and last names, the computerized records indicated sixteen different civil cases involving a "Robert Horne," with various middle initials, titles, and suffixes. If nothing else, the list was enough to alert the reader that "Robert Horne" was a common enough name to apply readily to more than one individual.

It was the third of the searches, that of the criminal records of the Montgomery County Circuit Court, that is critical to this appeal. Two Criminal Court Case Numbers were reported on and summarized, # 35690 and # 79341. The second of these, though again undated, purported to reflect Judge Kavanaugh's disposition of several charges on May 6, 1997.

```
CASE NUMBER:    79341
CHARGE: 1:      TRANSPORTING A HANDGUN BY VEHICLE
DISP:           GUILTY ONE YEAR SUPERVISED PROBATION [2]

CHARGE 2:       PERSONATING POLICE OFFICE
DISP:           NOT GUILTY
```

---

**2.** Actually, even that part of the record was inaccurately summarized by MIS and reported to Southern Services. There was no verdict of guilty of transporting a handgun. The disposition was one of probation before judgment.

That Criminal Case Number clearly referred to the Robert Horne who was the subject of the requested background check. The record sheets that accompanied the report showed, as part of the antecedent District Court records, that the subject of the charges had, indeed, the date of birth of "5–23–73," precisely the date of birth of the subject of the requested background check.

What the April 2, 2002 report on the results of the background check on Robert Horne also included, however, was the following ostensible record from the "Montgomery County Circuit Court." The first of the criminal cases reported on was Criminal Case # 35690. With no dates being shown, the report simply recorded:

```
MONTGOMERY COUNTY CIRCUIT COURT:
CASE NUMBER:    35690
CHARGE: 1:      THEFT
DISP: GUILTY    6 MONTHS JAIL

CHARGE: 2:      CONSPIRACY
DISP: NOLLE PROSEQUI
```

No date of birth and no social security number connected the Robert Horne who was sentenced to serve six months for theft to the Robert Horne on whom Southern Services sought a background check and whom Southern Services had identified far more precisely. The Robert Horne who was convicted of theft was not the Robert Horne who is the appellee and cross-appellant in this case.

The report of April 2, 2002 from MIS nonetheless communicated to Southern Services the unmistakable message that the subject of Southern Services's inquiry had been convicted and incarcerated for theft. There was no alert about the possibility of a misidentification based on nothing more than a common name. To accuse someone falsely of theft, of course, is defamatory *per se*. It remains only to be seen whether that publication was somehow privileged.

## The Age Discrepancy

The Robert Horne who was convicted of theft had been sentenced for that crime by Judge John J. Mitchell on May 14,

1986, when the Robert Horne on whom the background check was sought was only twelve years old (still nine days shy of his thirteenth birthday even as of the date of sentencing). Tammy White was questioned about the age discrepancy between the Robert Horne of the theft conviction and the Robert Horne who was the subject of the background check. Her response was, at the very least, insensitive to the damage that a misleading report might cause.

Q. What's the date of the disposition for the theft charge in the Circuit Court for Montgomery County?

A. May 14th, 1986.

Q. All right. Now, *you were provided with the date of birth of Mr. Horne?*

A. *That's correct.*

Q. All right. *Did you compare the date of birth with the date of disposition?*

A. *No, I did not.*

Q. *Why not?*

A. I printed out—as I was requested, I printed out the information and faxed it back. *No one asked me to analyze it for them.*

Q. When you faxed this cover sheet and the accompanying data sheets to Southern Pest Control on April 2nd, 2002, did you know that the individual mentioned in the theft disposition would have been 13 years old or so if he was the age that Mr. Horne was reported to on the transmittal sheet you got?

A. No.

(Emphasis supplied).

Tammy White had been given very specific identifying data about the Robert Horne on whom she was requested to do a background check. A glance at the information on which she relied, and which she included in her report, would have revealed that the Robert Horne who had been sentenced for theft in 1986 could not have been the Robert Horne whom she had been asked to investigate.

Tammy White's testimony was also critical in pointing out the significance of the summary or cover sheet as opposed to the copies of the computer printouts that were her source material. The latter is a collection of raw data. The former is processed intelligence. Ms. White first referred to the cover sheet.

Q When you completed your search, you prepared a summary of the results of your investigation for your client, in this case, AA Southern Services, correct?

A *I prepared my cover sheet, yes.*

Q Which is a summary. It is your summary of the information, correct?

A Well, *it's a guideline to guide them through the information* that I sent them.

(Emphasis supplied).

She acknowledged that the computer printouts themselves may be difficult for a layman to interpret.

Q You prepared that because *you recognize these printouts may be difficult for the client to read?*

A *I use it as a tool to assist them in reading the printouts that I send to them, yes.*

Q And you recognize that *for people who are not trained in the reading of those printouts, that you need to provide them guidance?*

A *Yes.*

(Emphasis supplied).

Ms. White also acknowledged that her summary with respect to the civil records affirmatively alerted the recipient that "there may be more than one person reflected in those records." No such alert, however, was made in the case of the criminal records.

Q And you made a point of indicating with respect to the civil records that there may be more than one person reflected in those records, correct?

A Correct.

Q   Now, *when it came to the District Court of Maryland, Criminal, everything was under one case number, correct?*

A   *That's correct.*

Q   And *when it came under the Montgomery County Circuit Court, everything was under that section, correct?*

A   *That's correct.*

Q   *You made no such representations* to AA Southern Services *that,* in the Montgomery County Circuit Court records, *there may be several individuals involved, did you?*

A   *No, I did not.*

Q   And *in that section, you reported two different sets of convictions, didn't you?*

A   *Yes, I did.*

(Emphasis supplied).

## Consequences of the False Report

When the results of the background check were received by Penny Clayborn at the Manassas office, David Clayborn, the district manager, immediately forwarded to Robert McMichael, the president of Southern Services in Virginia Beach, Virginia, the report that the criminal background check on Horne had revealed a theft conviction resulting in six months of incarceration.   McMichael decided to terminate Horne's employment and directed David Clayborn to direct James Lambert in Silver Spring to take action to that end.   On April 12, 2002, Lambert fired Horne from his job, notwithstanding Horne's protests that he had never been convicted of or incarcerated for theft and he was not the "Robert Horne" who had been so convicted.   It was established unequivocally that Horne would not have been fired from his employment with Southern Services if the report from MIS had not indicated that he had been convicted of and served a sentence of six months for theft.

We shall defer our factual summary of the circumstances surrounding Lambert's firing of Horne until we address directly Horne's cross-appeal against Southern Services.

### Qualified Privilege And the Proof of Malice

At the end of the plaintiff's case, the trial judge ruled that all three of the defendants still in the case—MIS, Tammy White, and Southern Services—were entitled to a qualified privilege and that Horne, therefore, had to prove actual malice in order to overcome that privilege. With respect to MIS and Tammy White, the judge ruled that Horne had produced a *prima facie* case that those two defendants had communicated the erroneous criminal background report to Southern Services with actual malice. The motion for judgment was, therefore, denied as to those two defendants, as it was again at the end of the entire case. The jury found actual malice and returned its verdict in favor of Horne on the claim of defamation. Both of the appellants' contentions focus on that element of malice.

With respect to Southern Services, on the other hand, the trial judge ruled that Horne had failed to produce legally sufficient evidence to generate an issue as to actual malice. The judge, therefore, granted the motion of Southern Services for a judgment in its favor. That is one of the two rulings that Horne challenges on his cross-appeal. The other challenge is to the judge's ruling that MIS and Tammy White enjoyed a qualified privilege in the first place. Horne does not argue that Southern Services was not entitled to a qualified privilege, only that Southern Services abused the privilege.

The entitlement of Southern Services to the qualified or conditional privilege is clear. Judge Karwacki wrote for this Court in *Happy 40, Inc. v. Miller*, 63 Md.App. 24, 31, 491 A.2d 1210 (1985):

> The conditional privilege accorded the defamatory remarks published to the fellow employees of the appellee was grounded upon the well settled privilege accorded to statements made within the context of the employer-employee relationship.

In *Stevenson v. Baltimore Baseball Club*, 250 Md. 482, 486, 243 A.2d 533 (1968), Judge Singley had similarly stated for the Court of Appeals:

Communications arising out of the employer-employee relationship clearly enjoy a qualified privilege.

See also *McDermott v. Hughley,* 317 Md. 12, 28, 561 A.2d 1038 (1989); *Henthorn v. Western Maryland R.R. Co.,* 226 Md. 499, 174 A.2d 175 (1961) (railroad employee accused of theft and fired—charge granted qualified privilege); *Beeler v. Jackson,* 64 Md. 589, 2 A. 916 (1886) (statements by employer accusing railroad employee of theft were qualifiedly privileged); *Darvish v. Gohari,* 130 Md.App. 265, 274, 745 A.2d 1134 (2000) ("Communications arising out of the employer-employee relationship clearly enjoy a qualified privilege."); *Shapiro v. Massengill,* 105 Md.App. 743, 661 A.2d 202 (1995).

## The Reciprocity of the Qualified Privilege

At this juncture, it is convenient to consider the second contention raised by Horne on his cross-appeal. He argues that the trial judge committed error in extending the qualified privilege enjoyed by Southern Services to MIS and Tammy White derivatively.

We have no difficulty in affirming the trial judge's decision that MIS and Tammy White enjoyed a qualified privilege. Factually the situation before us is indistinguishable from that which was before the Court of Appeals in *Wetherby v. Retail Credit Co.,* 235 Md. 237, 201 A.2d 344 (1964). In that case, the defendant Retail Credit Co. had been hired by various insurance companies to make background checks on applicants for insurance. The plaintiffs in that case sued Retail Credit for including in its report erroneous information about the plaintiffs that was defamatory. Although it was stipulated at the trial that Retail Credit was entitled to a qualified privilege, we find the approving dicta of Judge Hammond to be highly persuasive and we are persuaded.

At the trial *it was stipulated* (a) *that the credit company,* as a mercantile rating agency, *had a qualified or conditional privilege to fairly publish to its own legitimately interested business customers the information it received in the course of its investigations,* without being liable for defamatory matter therein, provided it did not exceed or abuse the

privilege; *(there appears to be a sound basis for this concession by the appellants;* see *Trussell v. Scarlett,* 18 F. 214 (Cir.Ct.D. of Md.[1883], Morris, J.); *Petition of Retailers Commercial Agency, Inc.,* 342 Mass. 515, 174 N.E.2d 376 [(1961)]; Annotation 30 A.L.R.2d 776; *Fresh v. Cutter,* 73 Md. 87, 20 A. 774; *Simon v. Robinson,* 221 Md. 200, 154 A.2d 911).

235 Md. at 239, 201 A.2d 344 (emphasis supplied).

The *Wetherby v. Retail Credit* dictum is now a holding. Self-evidently in the present case, the legitimate business interest that Southern Services had in checking up on the criminal background of its employee paralleled the reciprocal interest that MIS had in providing, for a fee, such background information to Southern Services.

*Marchesi v. Franchino,* 283 Md. 131, 135, 387 A.2d 1129 (1978), explained the general legal principle whereby conditional or qualified privileges

rest upon the notion that a defendant may escape liability for an otherwise actionable defamatory statement, if publication of the utterance advances social policies of greater importance than the vindication of a plaintiff's reputational interest ... *[T]he common law recognized that a person ought to be shielded against civil liability* for defamation *where,* in good faith, *he publishes a statement in the furtherance of his own legitimate interests,* or those shared in common with the recipient or third parties ...

(Emphasis supplied).

In *Darvish v. Gohari,* 130 Md.App. 265, 275, 745 A.2d 1134 (2000), Chief Judge Murphy held that a qualified privilege existed "where the speaker and the recipient have a common interest in the subject matter."

*One factor to be considered* in determining whether the publication falls within the standards of decent conduct *is whether the publication was made "in response to a request."* In this case, appellee expressly authorized CATD to seek information about his "character, general reputation and credit history" and to "obtain and share information

from and with any of its affiliated entities." Pursuant to that grant of authority, *CATD approached appellant and solicited information about appellee. Because appellant's offending publication was made "in response to an [authorized] inquiry and not volunteered," we are persuaded that he enjoyed "greater latitude about what he may say about [appellee] without incurring liability."*

(Emphasis supplied).

That opinion went on to state:

The Court of Appeals has "recognized that qualified privilege arising by reason of common interest in the subject matter can inhere in business dealings between the publisher and the recipient."

130 Md.App. at 276, 745 A.2d 1134 (quoting *Hanrahan v. Kelly*, 269 Md. 21, 28, 305 A.2d 151 (1973)). In this case, there was indisputably a "business dealing" between the publisher (MIS) and the recipient (Southern Services) of the information revealed by the records check.

In *Carter v. Aramark*, 153 Md.App. 210, 835 A.2d 262 (2003), the plaintiff had been an usher employed by the Baltimore Orioles. The defendant, Aramark, supplied concession services at Oriole Park. Aramark reported to the Orioles that the plaintiff was involved, along with one of Aramark's own employees, in acts of theft. At her criminal trial for theft, the plaintiff, however, was acquitted of that charge and then sued Aramark for defamation. Judge Thieme's opinion made it clear that Aramark enjoyed a qualified privilege.

A defendant in a defamation action may interpose the defense of a qualified, or conditional, privilege. *Gohari [v. Darvish]*, 363 Md. [42] at 55, 767 A.2d 321 [(2001)]. The Court there observed that *a defendant would not face liability for an otherwise defamatory statement "where, in good faith, he publishes a statement in furtherance of his own legitimate interests, or those shared in common with the recipient* or third parties...."

The alleged defamatory communications made by Aramark to the Orioles, and to employees of each organization,

are defended on the basis of the "shared interest" or "common interest" conditional privilege . . . .

It is clear that information held by Aramark, that Ms. Carter and Ms. Brunson might have been engaged in the activities in question here, would be important to the Baltimore Orioles.

153 Md.App. at 238–39, 835 A.2d 262 (emphasis supplied).

Southern Services obviously had an important business-related interest in knowing the criminal record, if any, of its employees or prospective employees. Montgomery Investigative Services, as its name asserted, was in the business of investigating such criminal records. Southern Services hired MIS to conduct such an investigation and to report back its findings. The business-related need to obtain such information was reciprocal to the business-related job to report such information. The two are obviously flip sides of the same coin, and the privilege that the communication itself enjoys necessarily covers the communicator and the communicatee alike.

Accordingly, MIS and Tammy White enjoyed, just as Southern Services did, a qualified privilege. In order for Horne to prevail in his defamation suit against any of the three, it would have been necessary for him to have shown sufficient actual malice to overcome the privilege.

### Actual Malice On the Part of MIS and Tammy White

The trial judge, at the end of the entire case, denied the motion for judgment by MIS and Tammy White based on their argument that there was insufficient evidence of actual malice to permit the case against them to go to the jury. The jury then found that there was actual malice on their parts and returned verdicts against them. The appellants' first contention is that there was, as a matter of law, insufficient evidence of actual malice to generate a genuine jury issue in that regard. Their second contention is that the judge erroneously instructed the jury on the subject of actual malice.

## Jury Instruction on Actual Malice

■ It will be convenient to dispose of that second contention first. On the privilege enjoyed by MIS and Tammy White and on the actual malice that must be found to defeat the privilege, the total instruction was as follows:

The Court has determined, as a matter of law, that *the Defendants are entitled to a qualified privilege.* In other words, the law recognizes that the publication of statements in certain situations advances social policies of greater importance than the vindication of a plaintiff's reputational interest, and thus, *the law gives a certain amount of protection to those persons making the statements.* The Defendants' qualified privilege, unless overcome, protects them from any liability to the Plaintiff for claims of defamation.

*Upon the request of an employer, a person or corporation that communicates an employee's criminal background to the employer is provided with a qualified privilege.* The qualified privilege may protect the person making the statement from liability even if the statement is false.

The qualified privilege given to the Defendants may only be overcome if a Plaintiff can prove, by clear and convincing evidence, that the Defendant abused the privilege by making the statements with actual malice. **ACTUAL MALICE EXISTS WHEN THE PERSON MAKING THE FALSE STATEMENT KNEW EITHER THAT THE STATEMENT WAS FALSE, OR THAT IT WAS ALMOST CERTAINLY FALSE, OR HAD OBVIOUS REASONS TO DISTRUST THE ACCURACY OF THE STATEMENT.**

(Emphasis supplied).

We have printed in bold capitals that part of the larger instruction dealing exclusively with actual malice. That is verbatim Maryland Pattern Jury Instruction–Civil 12:5 (4th ed. 2004):

Actual malice exists when the person making the false statement knew either that the statement was false, or that

it was almost certainly false, or had obvious reasons to distrust the accuracy of the statement.

That instruction is, moreover, completely consistent with the definition of actual malice employed by the Court of Appeals in *Capital–Gazette Newspapers, Inc. v. Stack,* 293 Md. 528, 540–41, 445 A.2d 1038 (1982):

> Accordingly, the *New York Times Co.* "actual malice" standard applies. Therefore, *the respondent had the burden of presenting sufficient evidence from which a trier of fact could find or infer,* by applying the clear and convincing evidence test, *that the publisher was aware that its editorial statements were false, or that it published them with reckless disregard of whether they were false.*

(Emphasis supplied). See also *Berkey v. Delia,* 287 Md. 302, 317–20, 413 A.2d 170 (1980); *A.S. Abell Co. v. Barnes,* 258 Md. 56, 77, 265 A.2d 207 (1970).

The appellants, citing no authority, attempt to make a strained distinction between knowing that the statement "was almost certainly false" and having "obvious reasons to distrust the accuracy of the statement." They argue that the latter possibility eliminates a scienter requirement present in the former. As we read the instruction, we deem both of those modalities to be alternative ways of publishing a statement "with reckless disregard of whether it is false." Indeed, publishing a statement after having an obvious reason to distrust its accuracy is simply the factual predicate from which a permissible inference may be drawn that the publisher knew that the statement "was almost certainly false." The publisher's state of mind, to wit, the publisher's actual knowledge, can frequently not be proved directly. It may, however, be inferred from the circumstances. We hold that the instruction on actual malice was perfectly proper.

### The Reckless Disregard of Truth

■ With respect to the appellants' first and primary contention, we affirm the decision of the trial judge to deny their motion for judgment. We agree with the trial judge that

there was legally sufficient evidence to permit the jury reasonably to find that MIS and Tammy White acted with a reckless disregard of truth. A reckless disregard of truth would constitute the actual malice necessary to defeat the qualified privilege otherwise enjoyed by them.

The "reckless disregard" standard for measuring malice was analyzed and adopted by the Court of Appeals in *Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978). Judge Levine's opinion for the Court could not be more clear.

> The view we take here finds support in the recent action of *the American Law Institute,* which, subject to an exception not relevant in this case, *adopted in Restatement (Second) of Torts § 600 (1977), "Knowledge of Falsity or Reckless Disregard as to Truth" as the malice necessary to defeat conditional privileges in defamation cases.* ...
>
> We hold, therefore, that *"knowledge of falsity or reckless disregard for truth" is the standard by which the malice required to defeat the conditional privilege defense is to be measured* in cases of private defamation.

283 Md. at 139, 387 A.2d 1129 (emphasis supplied). See also *Woodruff v. Trepel,* 125 Md.App. 381, 402, 725 A.2d 612 (1999) ("Malice means a reckless disregard of truth ...").

Although the evidence would not have compelled a finding that MIS and Tammy White acted with a reckless disregard of truth, it was enough to permit such a finding. A report to an employer on a criminal records check of an employee is patently a highly serious and sensitive matter with possibly dire consequences for both the employer and the employee. It is a matter calling for both accuracy and a good faith effort to interpret correctly the raw data.

Particularly when dealing with investigations as cursory as computerized checks of judicial databases, some interpretative skill is indispensable. The printouts themselves provide information in so truncated a form as to be cryptic. It could readily have been inferred that MIS was alert to the need for interpretation in that it did not simply pass on to its customers

the printouts themselves. Instead, it summarized and interpreted the raw data in its conclusory report to the customers.

In assessing the reckless disregard of truth, the jury may well have considered Tammy White's qualification, or lack thereof, for the job she was called on to perform. She had worked as a secretary for MIS since 1992. In 2001 she was assigned to do background investigations and was placed in charge of the background checks made on computer systems. She testified that she had received in-house training for her position from another MIS employee. When questioned in more detail, however, she described that training as instruction in "how to dial into the system and how to go into each criminal, civil, traffic level." There was no indication of any training in how to interpret the data that the records checks then revealed.

Q All right. *Did you receive any training on the criminal justice system* and how it works?

A *No.*

Q *Did you receive any training on the juvenile justice system* and how it works?

A *No.*

Q *Have you ever had any experience or training in the juvenile justice system and what level individuals can be charged with different crimes at different ages?*

A *No, I have not.*

(Emphasis supplied).

A perfect illustration of how the unskilled processing of raw data can easily lead to erroneous conclusions was the error with respect to Horne's trial for transporting a handgun. The actual disposition of the case in the Circuit Court for Montgomery County was one of "Probation Before Judgment." There was no criminal conviction. Tammy White's report to Southern Services, however, stated that Horne had been found guilty of the crime of transporting a handgun by vehicle.

In terms of Tammy White's inability to interpret the raw data, there were permissible inferences 1) that she was led

astray by the initial plea of guilty and 2) that she was not trained to appreciate the critical difference between a disposition of "Guilty" and a disposition of "Probation Before Judgment." These are matters that could have entered into the jury's "reckless disregard" calculation.

The more devastating error made by MIS and Tammy White, of course, was to report to Southern Services that Horne had been convicted of theft and incarcerated for six months. The initial inquiry made by Southern Services, significantly, did not ask about anybody who happened to be named "Robert Horne." It asked about one particular Robert Horne with a particular social security number. It asked about the Robert Horne who had been born on May 23, 1973.

That inquiry, with that identifier, was sitting in front of Tammy White when she interpreted and summarized the printout that showed a May 14, 1986 conviction and sentencing for theft. It should have been immediately apparent that the Robert Horne who was the subject of the inquiry was only 12 years old on May 14, 1986 and could not have been the person sentenced to jail for theft. When asked whether she had compared the date of disposition with her subject's date of birth, her answer that "No one asked me to analyze it for them" betrayed a blithe indifference to the sensitive nature of the material she was processing. Blithe indifference to whether the subject of her inquiry had truly been convicted of theft is tantamount to "reckless disregard" of whether the subject of her inquiry had truly been convicted of theft. She nonetheless reported to Southern Services that there had been such a conviction of the Robert Horne who was the subject of the inquiry.

We affirm the trial judge's decision to let the defamation case against MIS and Tammy White go to the jury.

### Abuse of the Privilege By Southern Services

We turn finally to Horne's primary contention on his cross-appeal. He contends that the trial judge erroneously granted

judgment, as a matter of law, in favor of Southern Services. We agree that that was error.

Although Southern Services initially enjoyed a qualified privilege, the evidence permitted a finding that it acted with sufficient actual malice to defeat the privilege. The actual malice on the part of Southern Services, however, was of a completely different variety than the actual malice that the jury found on the part of MIS and Tammy White.

A qualified privilege may be lost if it is exercised in an unreasonable or abusive manner. Judge Robert Bell (now chief Judge of the Court of Appeals) wrote for this Court in *Mareck v. Johns Hopkins University,* 60 Md.App. 217, 224–25, 482 A.2d 17 (1984):

> *A qualified privilege will exist only if exercised in a reasonable manner* and for a proper purpose. Where the foundation for granting the qualified privilege no longer exists, the privilege is lost and the publisher is subjected to liability. This will occur under the following circumstances: ... (3) *the statement is made to a third person other than one "whose hearing is reasonably believed to be necessary or useful to the protection of the interest ..."*

(Emphasis supplied).

On the question of whether Horne showed sufficient evidence of such an abuse of the privilege as to constitute actual malice, Judge Bell articulately described the deferential standard that should have been applied in favor of Horne, as the non-moving party, on that question.

> In considering a motion for a directed verdict, *the trial court must accept as true all credible evidence on the issues and all inferences fairly flowing from that evidence and consider them in the light most favorable to the party against whom the motion is made. If there is any legally relevant competent evidence, no matter how slight,* from which a rational mind could infer a fact in issue, then *the court would be invading the jury's province by granting a*

*directed verdict.* Under those circumstances, the directed verdict should be denied and the case submitted to the jury.

60 Md.App. at 225, 482 A.2d 17 (emphasis supplied).

■ Generally speaking, moreover, the question of whether a privilege has been abused is a question of fact for the jury.

Whether a defamatory statement is entitled to a qualified privilege is a question of law for the court, but *whether that qualified privilege has been abused is generally a question of fact for the jury.*

60 Md.App. at 227, 482 A.2d 17 (emphasis supplied).

Even a defendant who enjoys a qualified privilege to publish defamatory information may lose that privilege if the manner in which he publishes it is deemed to be unreasonable, excessive, or abusive. In terms of understanding what circumstances may serve to make an otherwise privileged publication unreasonable or abusive, the line of demarcation between abuse and non-abuse is effectively bracketed by *Happy 40, Inc. v. Miller,* 63 Md.App. 24, 491 A.2d 1210 (1985) and *General Motors Corp. v. Piskor,* 277 Md. 165, 352 A.2d 810 (1976).

### A. *Happy 40 v. Miller*

In the *Happy 40* case, the plaintiff, Stephanie Miller, was fired from her managerial job because her employer suspected her of theft. No theft was ever established, and the various statements that Miss Miller had somehow been involved in a theft were "concededly defamatory statements." 63 Md.App. at 29, 491 A.2d 1210.

The defamatory publications with which Miss Miller charged the employer fell into two categories. Judge Karwacki's opinion described the two types of publication.

As we noted earlier, *the defamatory statements* attributable to Booher *were issued in two distinct contexts—in response to inquiries by co-employees* of the appellee *and in response to an inquiry by the Employment Security Administration which was evaluating the appellee's claim*

*for unemployment compensation* following her discharge. The issues presented by these statements have been narrowed by the appellants' concession that the appellee sufficiently proved their defamatory nature.

63 Md.App. at 31, 491 A.2d 1210 (emphasis supplied).

It was ruled in the case, quite properly, that the employer enjoyed a qualified privilege "grounded upon the well settled privilege accorded to statements made within the context of the employer-employee relationship." *Id.* The issue in the case was whether the behavior of the employer, in the course of responding to the three inquiries, amounted to an abuse of the privilege.

[W]e shall focus on *the issue of whether there was* legally sufficient evidence of an y abuse of the qualified *privileges* under which these statements were uttered by Booher.

63 Md.App. at 32, 491 A.2d 1210 (emphasis supplied).

In holding that the employer's response to the three inquiries about his reason for firing Miss Miller did not constitute such abuse as to defeat the employer's privilege, an important factor was that the publication of the suspected theft was not volunteered but was only made in response to inquiries.

*[W]here the defamatory publication is,* as in the case *sub judice, in response to an inquiry and not volunteered, the defendant is afforded greater latitude* in what he may say about the plaintiff without incurring liability.

63 Md.App. at 35, 491 A.2d 1210 (emphasis supplied).

The manner in which the employer answered the questions posed to him was held by this Court to have been reasonable and non-abusive. It did not, therefore, constitute sufficient evidence of actual malice to generate a jury issue in that regard.

In the instant case, *there is no evidence* from which a jury could reasonably find *that Booher did anything but answer the questions posed to him in a reasonable manner.* He fired the appellee because he suspected her of stealing. *The conditional privilege* that all parties agreed existed in

this case *was clearly for the purpose of permitting Booher to explain to his remaining employees the reason for the appellee's discharge.* If he were not permitted to tell them his reasons, he would run the risk of appearing arbitrary and capricious. This would affect the remaining employee's morale and sense of security and such a situation would not be in the best interests of the appellants. *There was no evidence that Booher used "the occasion as an opportunity to wreak his ill-will upon the [appellee], to abuse and vilify [her], and to injure [her] in the estimation of [her] neighbors." The answers to the questions of both employees and the Employment Security Administration authorities were unquestionably in line with the purpose for which the privilege was granted.* We, therefore, hold that although the appellee was an employee "at will" and Booher had no obligation to disclose the reason for her discharge to her co-employees, to do so in order to protect his lawful interests does not constitute an abuse of the conditional privilege.

63 Md.App. at 35–36, 491 A.2d 1210 (emphasis supplied).

### B. *General Motors v. Piskor*

In sharp contrast to the situation in the *Happy 40* case, *General Motors v. Piskor*, 277 Md. 165, 352 A.2d 810 (1976), is a helpful illustration of how the manner of publishing otherwise privileged matter may become so abusive as to abrogate the privilege.

Piskor, a worker on the General Motors assembly line, was suspected by his foreman of stealing small items of significant value from the company and of concealing them in his army fatigue jacket as he was leaving his shift for the day. In fact, Piskor had stolen nothing and had concealed nothing. The foreman pointed to Piskor as he was leaving the plant and shouted something to the security guards. The guards grabbed Piskor and publicly escorted him to a glass-enclosed security office in full view of fellow workers. The opinion for the Court of Appeals by Judge Levine first established that a defamation—a false accusation of theft—may be published by conduct as surely as by express words.

General Motors has conceded, as it must, that *defamatory matter may be published by actions and gestures as well as by the written and spoken word. See M & S Furniture [Sales Co.] v. DeBartolo Corp.,* 249 Md. 540, 544, 241 A.2d 126 (1968); Restatement of Torts § 568(2) (1938). Here, *the jury was properly permitted to conclude that the conduct of the defendant's employees, such as the waving of a finger in front of the plaintiff, conveyed to the plaintiff's fellow employees a defamatory imputation of theft.*

277 Md. at 171 n. 2, 352 A.2d 810 (emphasis supplied).

The Court of Appeals held that General Motors "was protected by a common law conditional privilege with respect to the defamation in this case." 277 Md. at 172, 352 A.2d 810. It then went on to explain the ways in which the privilege may be lost.

In *Jacron [Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976)], we reaffirmed *the definition of malice necessary to defeat a conditional privilege to defame* which we had previously enunciated in *Stevenson v. Baltimore [Baseball] Club,* 250 Md. 482, 486–87, 243 A.2d 533 (1968):

> "*The privilege may be lost,* however, *if the plaintiff* in a defamation *case can show malice, which in this context means* not hatred or spite but rather a reckless disregard of truth, the use of unnecessarily abusive language, or other *circumstances which would support a conclusion that the defendant acted in an ill-tempered manner* or was motivated by ill-will."

*Accord, Orrison v. Vance,* 262 Md. 285, 295, 277 A.2d 573 (1971).

*Id.* (emphasis supplied).

The Court of Appeals held that the excessively public manner in which the imputation of theft was communicated to Piskor generated a jury question as to whether the privilege had been abused.

> [T]he evidence indicates that *Piskor was forced into the glass-enclosed office where management precipitated a confrontation in full view of virtually two entire shifts,* about

5,000 employees in all, who, on their way in or out of the plant, necessarily filed past the office. *A conditional privilege to defame may be abused not only by publishing the defamation in reckless disregard of the truth, but also by publication to third persons other than those whose hearing is reasonably believed to be necessary or useful to the protection of the interest, i.e., by an excessive publication.* Restatement of Torts § 604 (1938); W. Prosser, Law of Torts § 115 at 792–93 (4th ed. 1971). *The conduct of General Motors' management,* if found by the jury to contain an imputation of theft, *might have been regarded as excessive under the circumstances and therefore an abuse of the privilege.*

We hold, therefore, that *there was sufficient evidence to warrant submitting to the jury the question whether the conditional privilege had been abused.*

277 Md. at 173–74, 352 A.2d 810 (emphasis supplied).

## C.   The Behavior of James Lambert

■ The manner in which James Lambert communicated to Horne that he was being fired "because he was a convicted thief" was not only arguably abusive, it was arguably outrageously abusive. The circumstances in which the defamation was published were far more akin to those in *General Motors v. Piskor* than to those in *Happy 40 v. Miller.* In many ways the publication was more abusive and more excessive than the publication in *General Motors v. Piskor* had been.

In *Happy 40,* the termination was communicated by the employer to Miller alone in the privacy of his office. In this case, by contrast, when Lambert approached Horne to fire him, there was immediately available a private, walled-in office where the message could have been communicated. Lambert chose, instead, to communicate the message in open office space in a public work area and in the presence and full hearing of three of Horne's fellow workers.

In *Happy 40,* the reason for the termination was later given to two employees only in response to their inquiries. In this

case, the contemporaneous publication of the defamation was completely gratuitous. In *Happy 40,* the explanations offered to the fellow employees were very brief and to the point.

[I]mmediately after the appellee was discharged, Deborah Parker, then a cashier at Happy 40, approached Booher and inquired as to the reason that the appellee had been fired. Parker testified that Booher responded that "he had had evidence that there had been some money missing."

Jean Hamilton, another cashier at Happy 40, approached Booher and inquired as to the reason the appellee was fired. Hamilton testified that Booher responded, "the tapes were being fixed, the readings, and that's how she was taking the money."

63 Md.App. at 28–29, 491 A.2d 1210.

In the present case, Lambert's excoriation of Horne, in the full hearing of the other three employees, went on for the better part of an hour. Horne described the nature of the accusation.

A He said, *"I have to let you go because you've been convicted of theft."* He said, *"You're a thief,* man." In his words.

Q Is that the words he used?

A Correct.

(Emphasis supplied).

Horne insisted that he had never been convicted of theft, but Lambert persisted in his accusation.

Q Now, after he called you a thief, what happened?

A I stopped and I said, "A thief?" I asked him what was he talking about. And he goes. "Yeah man," he *said, "You've done six months in prison, man."* He said, *"Your background check,"* he said, *"you've done six months in prison."* He goes, "yeah, sorry, man, *we can't have you working up in here."* He said, and he told me, he said, "You up here," he said, "you up here impersonating police officers." You got, what do you call it, he said, "You got

time for doing," what do you call it, "six months as a thief." He said, "We can't have you working here."

And so I stopped. And *I said, well, I said, "I'd like to see."* I said, I stopped and *I said, "Well, I don't think that was me."* *I said, "I think you have me confused with someone else."*

And I thought it was a prank, myself. But when he stopped, and I could see that he was serious and he said, "Yeah, man, sorry, we can't have you working here." He said, and *everybody else was just standing there looking.* And I said, "Well, where did you get this information from?" And *he goes, well, I got this information, he said when they ran the background check* that *they got the information.*

*So I asked him for a copy.* And *I was called a convict.* I didn't like being called that, especially when I'm not one. *I was called a thief and a convict. I was called a thief repeatedly.* And *it was repeatedly beat into my head that I had done six months prison time.*

(Emphasis supplied).

Horne insisted on seeing a copy of the background report that he had been convicted of theft.

So I asked him if he could prove it. *I said, "Well, can I see a copy of this report?"* And he wound up giving me, he wound up saying, "Well, sorry, I can't." First he said, to my recollection, he said, "Sorry, well, I'm not going to be able to do that." And I stood there and I said, *"Look, man," I said, "can I get a copy of this report so I can see that on there for myself?"*

So at that point he said, "Well, hold on a second, I can do that for you." He said, "Because you're up here denying it." He said, "I'll get a copy of it." And he said, *"Once I give you the copy,"* and *he said, "I'll prove it to you."*

(Emphasis supplied).

Ultimately, the single-paged report from MIS was faxed from Southern Services's Manassas office to Lambert

**A**  *He got the fax and he showed it to me.*  And at this time *when he's showing me the fax all of my employees*—or *everybody that I worked with, they're standing over looking at the paper as I'm reading the paper or as I'm looking at it, they're standing over it too.*

And sure enough, *on the fax,* I looked down and he *pointed it out.  He said, "See, right there."*  He says, *"Convicted for theft."*  And *he said, "Right there, six months jail time."  He said, "Right there, man."*  He said, *"See, right there, six months jail time."*

He goes, "You're a convict, man."  He said, but, and I sat back and I said, "Look," I said, "that's not me."  I said, "There's been some type of mistake."  I said, "I think I would remember spending six months in jail."  I said, "I don't think that would be something that I would forget, spending six months in jail."  I said, "I think that would be something I would like to forget if I spent six months in jail."  But I said, "I don't think that would be something that I would forget if I spent six months in jail."

And *at that time* the gentleman, *Brian, he said, "Yeah, I spent some time in jail."*  And he, as in, more than a day, I'm not quite sure exactly what the length was, but *he said he spent some time in jail.*  And he said, in his words, "Sure enough, that's something you don't forget.  If you spend any time in jail you don't forget that.  You're in there for days.  You've got to watch your back in there."  And he said, "That's something you don't forget if you spent time in a jail, in prison."

And I sat back and I said, "Yeah," I said, "that's my point."  And *I said, "But I haven't."  He said, "Well, yeah, man, but it say right there on that sheet of paper, man, everybody saw it.  It says right there on that sheet of paper that you spent time in jail for theft.  If you're a thief just go ahead and admit it, man.  I mean, just, that's what you are, man."*

(Emphasis supplied).

We hold that the evidence was legally sufficient to generate a jury question as to whether the circumstances in which the

defamation was published by Southern Services was sufficiently abusive and excessive as to overcome its qualified privilege to publish the defamation. The trial judge, therefore, was in error in granting judgment in favor of Southern Services on that issue at the close of the plaintiff's case. The case of Horne against Southern Services will be remanded for a new trial.

JUDGMENT AGAINST MONTGOMERY INVESTIGATIVE SERVICES, LTD. AND TAMMY WHITE AFFIRMED; JUDGMENT IN FAVOR OF SOUTHERN SERVICES REVERSED AND CASE REMANDED FOR NEW TRIAL; COSTS TO BE DIVIDED EVENLY AMONG MONTGOMERY INVESTIGATIVE SERVICES, LTD., TAMMY WHITE, AND SOUTHERN SERVICES.