*Charles M. Royall v. Allen Dicks, et. al.*, No. 0597, Sept. Term, 2024. Opinion filed on April 3, 2026, by Wells, C.J.

## DEFAMATION – PUBLICATION – PLEADING SUFFICIENCY

Publication of a defamatory statement occurs whenever the statement is communicated to someone other than the person being defamed; mass distribution is not required. At the pleading stage, a plaintiff need only allege facts from which a court can reasonably infer the false statements were made to third parties under circumstances public enough for the plaintiff to have learned of them. The low threshold to plead publication does not require the plaintiff to allege he was present when the statements were made or to explain precisely how he learned of them.

In this case, Royall alleged Dicks made statements to two of Royall's former co-workers, whom he identified by name, at Royall's former workplace. These allegations were sufficient to plead publication.

## DEFAMATION – DEFAMATION PER SE – PRECEDENTIAL EFFECT OF *WETHERBY V. RETAIL CREDIT CO.*

In *Wetherby v. Retail Credit Co.*, 235 Md. 237 (1964), the question of whether false statements about a person's sexual orientation were defamatory per se was neither contested nor litigated. The case was tried on premises, agreed upon by the judge and counsel, that the statements were libelous per se, and it went to the jury solely on whether the defendant credit company had abused its qualified privilege to publish those statements. Because neither the trial court nor the Supreme Court of Maryland was called upon to decide whether false statements about sexual orientation are defamatory per se, Wetherby does not establish Maryland precedent on that question.

## DEFAMATION – DEFAMATION PER SE – SEXUAL ORIENTATION

Under Maryland law, false statements about a person's sexual orientation are not defamatory per se. A statement is defamatory per se only when its injurious character is a self-evident fact of common knowledge such that courts should excuse the plaintiff from pleading and proving reputational injury. Profound changes in the legal and cultural landscape—including the decriminalization of consensual same-sex activity, the constitutional recognition of same-sex marriage, and extensive federal and state antidiscrimination protections—reflect that our common experience has evolved such that misstating a private person's sexual orientation does not presumptively demean that person or suggest he or she is deserving of social approbation. Treating such statements as defamatory per se would rest on the flawed premise that non-heterosexual orientation is inherently shameful or disgraceful, which is inconsistent with Maryland public policy and

the judiciary's obligation under Maryland Rule 18-102.3(b) not to manifest bias based on sexual orientation.

In this case, because Dicks' statements pejoratively calling Royall a "fag" were not defamatory per se, Royall was required to plead and prove actual reputational injury.

## DEFAMATION – DEFAMATION PER QUOD – INSUFFICIENT PLEADING OF ECONOMIC INJURY

When a statement is not defamatory per se, it may still be actionable as defamation per quod, if the plaintiff pleads and proves actual reputational injury resulting in economic loss. The plaintiff must allege some specific claim of actual economic or pecuniary harm; lowered social standing and its purely social consequences are insufficient. A plaintiff's subjective belief that he could not seek an employment reference from a former employer, without particularized allegations that the employer would have repeated the defamatory statements to prospective employers or that specific employment opportunities were lost because of the statements, does not satisfy this pleading requirement.

In this case, Royall alleged only that he lost unspecified employment opportunities and was scorned by former co-workers and that he believed he could not seek a reference from his former employer. Because these allegations did not establish a reasonable expectation that false statements about his sexual orientation would be repeated to prospective employers or otherwise cause economic loss, the Amended Complaint failed to state a claim for defamation per quod.

## DEFAMATION – CONDUCT AS DEFAMATORY STATEMENT – HAND GESTURES

A single silent and equivocal gesture, such as a fist pump, does not constitute an affirmative adoption of another person's defamatory statement when the plaintiff does not allege he witnessed the gesture and the gesture is alleged to be a repetition of the same gesture made in a different, non-defamatory context years earlier. It is too remote and speculative to infer from such a gesture that the person making it adopted the substance of the accompanying defamatory statement.

In this case, Jewell's alleged "right on" hand gesture in response to Dicks' statement did not constitute a separately actionable defamatory statement about Royall's sexual orientation.

Circuit Court for Prince George's County
Case No.: CAL22-08082

REPORTED

IN THE APPELLATE COURT

OF MARYLAND

No. 597

September Term, 2024

_____

CHARLES M. ROYALL

v.

ALLEN DICKS, ET AL.

_____

Wells, C.J.
Ripken,
Woodward, Patrick L.
    (Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Wells, C.J.
_____

Filed: April 3, 2026

Pursuant to the Maryland Uniform Electronic Legal
Materials Act (§§ 10-1601 et seq. of the State
Government Article) this document is authentic.



Gregory Hilton, Clerk

In this appeal from the dismissal of a private defamation complaint, we are asked to decide whether false statements about sexual orientation are defamatory per se because "their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved." *M & S Furniture Sales Co. v. Edward J. Bartolo Corp.*, 249 Md. 540, 544 (1968). After clarifying that *Wetherby v. Retail Credit Co.*, 235 Md. 237 (1964) did not decide this question, we hold that under Maryland law, false statements about sexual orientation are not defamatory per se. Because "our 'common experience' has evolved as a result of public and private measures reflecting current attitudes" toward sexual orientation, *see Conover v. Conover*, 450 Md. 51, 77 (2016), statements falsely imputing that an individual is gay[1] are not so inevitably and obviously harmful to the reputation of a non-public figure that Maryland courts will excuse defamation plaintiffs from pleading and proving their injuries.

Examining the statements alleged here – pejoratively calling Charles M. Royall, appellant, a "fag" to his former co-workers – we also conclude they were not defamatory under the circumstances alleged by Royall, i.e., defamatory per quod. Consequently, we will affirm the Circuit Court for Prince George's County's judgment dismissing without prejudice Royall's complaint against his former supervisors, Allen Dicks[2] and Keith Jewell, and his former employer, C&C Meat Sales ("C&C") (together, "Appellees").

---

[1] For economy and clarity in this opinion, we use the term "gay" broadly to encompass all non-heterosexual orientations.

[2] We use Mr. Dicks' spelling for his first name, rather than the alternative spelling in Mr. Royall's pleadings.

**FACTUAL AND PROCEDURAL BACKGROUND**

*Royall's Initial Complaints*

In March 2022, Royall filed a complaint against Dicks and Jewell in the Circuit Court for Prince George's County. Representing himself, he alleged "continued defamation of character and publications of defamation after/since the filing of" a prior lawsuit in which he had settled claims of sexual harassment and age discrimination during his employment.[3] That handwritten form complaint does not allege any supporting facts or otherwise identify the nature of the defamatory statements. Royall requested compensatory damages of $200,000, plus interest and costs for "los[t] wages and future los[t] wages."

On June 16, 2022, Royall filed a superseding complaint, adding a claim for workplace sexual harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* Royall alleged "during the four years [he] worked at C&C[,]"—which "ended June, 2018[,]" and thereafter—Dicks and Jewell "continued to make statements" that Royall "is gay (homosexual)." "These statements are so egregious[,]" Royall averred, "that they will always be considered defamatory and are assumed to harm [his] reputation, without further need to prove that harm."

According to Royall, "Dicks stated several times during the four years" Royall was working at C&C "that all Black Men that shave their face (removing all of the hair are

_____

[3] In the referenced lawsuit filed in the United States District Court for the District of Maryland, Royall settled civil claims stemming from his employment at and termination from C&C. Royall had alleged discrimination based on race, sex, and age, against the same three defendants who are Appellees here. On April 23, 2021, after Royall settled with Appellees, via "a release of 'any claims arising from his former employment'" at C&C, that case was dismissed with prejudice.

2

homos (gay/homosexual)." Royall alleged "[t]his statement made to third parties was clearly about" him, given he has "shave[d] his face completely for more than fifty years" and "is not married." Despite recounting instances he believed call into question Dicks' sexual orientation, Royall denied "calling and/or implying" that Dicks "is gay/homosexual[,]" while also insisting that he himself is "NOT gay/homosexual[.]"

Dicks' statements about Royall's sexual orientation were "not only demonstrably false," but "defamatory per se" because homosexuality "is a crime involving moral turpitude" that is prejudicial to "his career . . . and reputation[,]"which "were devastated when [Allen] Dicks terminated [him] back in June, 2018," given he "was out of work for well over a year." Royall alleged that because Dicks and Jewell "continue to make false statements about" his sexual orientation, he "can not (sic) tell a prospective employer" to contact C&C for an employment reference. Seeking "compensatory damages for the reputational harm he has suffered as a result of . . . [the] false and defamatory implication that [he] is a gay/homosexual[,]" Royall alleged this lawsuit represents his attempt "to clear his name" and "restore his reputation" by establishing "legal liability for [a] continuing campaign to push this falsehood that [he] is gay/homosexual."

Appellees removed the case to the United States District Court for Maryland based on its jurisdiction over the federal Title VII sex discrimination claim. Appellees then moved to dismiss the case on the ground that Royall had settled all claims arising from his employment at C&C. In response, Royall filed two amended complaints, on July 14, 2022, and with leave of court on August 30, 2022, asserting only a defamation claim under Maryland law and adding C&C as a defendant. As a result, the federal court remanded the case to the circuit court.[4] We will refer to Royall's August 30, 2022 pleading as the "Amended Complaint."

Because the Amended Complaint eliminates claims arising from events during Royall's employment, it does not include all the factual allegations that appear in his previous complaints. Instead, Royall pleads that "[t]his defamation case arises from false accusations . . . that [he] is a homosexual[,]" which continued in the aftermath of his termination, "intending to harm [his] career, damage his reputation, and cause him emotional distress, which they did. This lawsuit seeks to right those wrongs."

---

[4] Because the settlement of Royall's previous lawsuit, including his Title VII claims arising from his employment and discharge, *see supra* note 3, was the basis for the federal court's remand of this case to the circuit court for lack of a jurisdiction over a federal question, references to that settlement by counsel for Appellees, whether in that case or this one, did not constitute improper argument. In these circumstances, Md. Rule 5-408 (and its federal analog), restricting admission into evidence of statements made in mediations "to prove the validity, invalidity, or amount" of a claim in a civil action, does not apply. *Cf. Est. of Castruccio v. Castruccio*, 247 Md. App. 1, 70 (2020) ("The obvious purpose of the rule is to encourage candor during settlement discussions by prohibiting one party from exploiting another party's concessions[,]" but the rule does not apply when evidence is offered for another purpose, such as proving that a party "was litigating in bad faith").

Royall alleges he "is a Management Accountant and a former employee of . . . C&C" who worked "under the supervision, and Management of [Allen] Dicks and Keith Jewell." On November 22, 2021, Allen Dicks, who was C&C's Night Manager, stated "to [Mr. Timothy Mobley], an evening office employee, the following: 'Mr. Royall is no longer at C&C. . . , at least we don't have to smell that fag." In response, Keith Jewell, who had been Royall's supervisor during his employment, allegedly "gave [Allen] Dicks the 'right on!'" hand gesture "[t]he same way [he] did the evening . . . Dicks terminated" Royall. Later the same day, Dicks "reiterated to [Mr. Mark Close] a Day Shift Manager at C&C . . . those exact words: 'Mr. Royall is no longer at C&C . . . , at least we don't have to smell that fag."

Alleging these "factual assertions that [he] is a stinking homosexual are categorically and demonstrably false" and "also defamatory per se[,]" Royall claims that "Dicks has this extreme belie[f] that is drilled in his brain: 'that all Black American Men that shave all of the hair off their face are homosexual.'" Moreover, "these slanderous assertions" were "made with actual malice, knowing that their statements were false or in reckless disregard of the statements' truth or falsity[,]" with the intent "to harm [Royall's] career, damage his reputation, and cause him embarrassment, humiliation, and emotional distress."

Royall alleges that, "unsurprisingly, [Appellees'] "statements had precisely that effect." "As a direct result of [Appellees] slandering [his] character," Royall claims that his "reputation and career sustained profound damages. [He] lost business opportunities and faced scorn from his former coworkers and colleagues." In addition, he "suffered embar[]assment, humiliation, and emotional distress, in an amount to be determined at

5

trial." Because Appellees' "actions were malicious, willful, and wanton, and evidence a conscious disregard for [his] rights[,]" Royall asserts "punitive damages are appropriate."

*Post-Remand Dismissal and Appeal*

Through counsel, Appellees jointly moved to dismiss Royall's Amended Complaint, contending that neither the alleged statements by Dicks calling him a "fag," nor the hand gesture by Jewell allegedly adopting that statement, were defamatory, either on their face or in the circumstances described. Royall, citing *Wetherby v. Retail Credit Co.*, 235 Md. 237, 240 (1964), filed written opposition to the motion. In his pleadings and at the April 26, 2024 motion hearing, he argued that his Amended Complaint sufficiently alleges a claim for defamation because *Wetherby* stands for the proposition that under Maryland common law, making a false statement about a person's sexual orientation is defamatory per se.

The circuit court disagreed, ruling Royall failed to state a claim against Dicks, Jewell, or C&C. Citing the reasons advanced by Appellees, the court gave no "weight to the . . . 1964 case cited by" Royall that "an allegation of homosexuality is defamation, per se." After the court entered a written order dismissing Royall's Amended Complaint without prejudice, Royall noted this timely appeal.

Continuing to represent himself in this Court, Royall raises twelve issues collectively challenging the dismissal of his claims on the ground his Amended Complaint adequately pleads a claim for defamation per se and per quod against all three defendants.[5]

---

[5] In his brief, Royall presents the following questions:

(continued)

6

We will address Royall's contentions in the context of explaining why the motion court did not err in granting the motion to dismiss the Amended Complaint against all three Appellees.

---

1). Whether the Appellant stated a claim for defamation.

2). Whether the attorney for the Appellee made two improper arguments.

3). Whether the claim against the Appellee Allen Dicks should not be dismissed.

4). Whether the claim against the Appellee Keith Jewell should not be dismissed.

5). Whether the claim against the Appellee C&C MEAT SALES, Inc. should not be Dismissed.

6). Whether the Appellant stated a claim for defamation per se.

7). Whether the Appellant stated a claim for defamation per quod.

8). Whether the Appellant stated a claim for respondeat superior.

9). Whether the Appellee Allen Dicks statements were made from spite, intending to harm the Appellant's career, damage the Appellant's reputation, and cause embarrassment, humiliation, and emotional distress.

10). Whether the defamatory statements were published.

11). Whether Allen Dicks terminated the Appellant because the Appellant assaulted the Appellee Allen Dicks.

12). Whether the affidavit of the Appellant description of the Appellee Allen Dicks must be given serious consideration.

## LEGAL STANDARDS GOVERNING
## REVIEW OF DEFAMATION COMPLAINT

We review without deference the dismissal of Royall's Amended Complaint for failure to state a claim upon which relief could be granted, asking whether the motion court was legally correct. *See Hollabaugh v. MRO Corp.*, 491 Md. 165, 171 (2025). When doing so, we "assume the truth of, and view in a light most favorable to" Royall, as "the non-moving party, all well-pleaded facts and allegations contained in the complaint, as well as all inferences that may reasonably be drawn from them[.]" *Id.* (cleaned up). "[W]e will affirm the circuit court's judgment on any ground adequately shown by the record, even one upon which the circuit court has not relied or one that the parties have not raised." *Sutton v. FedFirst Fin. Corp.*, 226 Md. App. 46, 74 (2015) (citation omitted).

To plead a claim for private defamation, a complaint must allege: (1) the defendant made a defamatory statement to a third person; (2) the statement was false; (3) the defendant was at fault in making the statement; and (4) the plaintiff suffered harm.[6] *See Piscatelli v. Van Smith*, 424 Md. 294, 306 (2012). A false statement is defamatory when it exposes the plaintiff "to public scorn, hatred, contempt[,] or ridicule, thereby discouraging others in the community from having a good opinion of, or associating with, that person[.]" *Seley-Radtke v. Hosmane*, 450 Md. 468, 482-83 (2016).

---

[6] Throughout this opinion, we address only private defamation claims. The pleading and proof standards differ for defamation claims made by a public figure or limited public figure. *See Seley-Radtke v. Hosmane*, 450 Md. 468, 473-74 (2016) (holding that statements regarding public officials and public figures on matters of public concern are subject to qualified First Amendment conditional privilege that can be overcome only by actual malice).

8

Maryland courts "continue[] to recognize the distinction between defamation per se and defamation per quod." *Shapiro v. Massengill*, 105 Md. App. 743, 773 (1995).

> [A]ctions or conduct as well as spoken or printed words could be actionable per se or per quod. The distinction is based on a rule of evidence and the difference between them lies in the proof of the resulting injury. In the case of words or conduct actionable per se, their injurious character is a self-evident fact of common knowledge of which the court takes judicial notice and need not be pleaded or proved.
>
> In the case of words or conduct actionable only per quod, the injurious effect must be established by allegations and proof of special damage and in such cases it is not only necessary to plead and show that the words or actions were defamatory, but it must also appear that such words or conduct caused actual damages.

*M & S Furniture Sales Co. v. Edward J. Bartolo Corp.*, 249 Md. 540, 544 (1968). *See Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441 (2009); *Shapiro*, 105 Md. App. at 773.

Under these standards, litigants pleading defamation have three advantages. *First* and *second* among these benefits, the "'presumption of harm to reputation . . . aris[ing] from the publication of words actionable per se'" and "made with actual malice" means that Maryland courts do not require the plaintiff to either plead or prove reputational injury, on the theory that when "the words themselves impute the defamatory character, no innuendo – no allegation or proof of extrinsic facts – is necessary[.]" *Indep. Newspapers*, 407 Md. at 441 (cleaned up). *See Harvey-Jones v. Coronel*, 239 Md. App. 145, 155 (2018). "'In other words, if the statement is defamatory per se, damages are presumed when a plaintiff can demonstrate actual malice, by clear and convincing evidence, even in the absence of proof of harm.'" *Id*. (quoting *Samuels v. Tschechtelin*, 135 Md. App. 483, 549-

9

50 (2000)). *See also Am. Stores Co. v. Byrd*, 229 Md. 5, 12-14 (1962) ("If the words and behavior are actionable per se, it is . . . unnecessary to either allege or prove special damages."); MPJI-Cv 12:1 DEFAMATION--GENERALLY; *see* MPJI-Cv 12:7 PRESUMED DAMAGES (when a person is the subject of a statement that is defamatory per se and "made with actual malice, there is a presumption that the statement causes that person harm, and relief may be awarded even in the absence of any evidence of actual damages").

*Third*, and equally important, when a statement is defamatory per se and made with malice, the plaintiff can recover three types of damages: actual (economic) damages, punitive damages, and presumed (or noneconomic) damages. *See M & S Furniture*, 249 Md. at 544; *McClure v. Lovelace*, 214 Md. App. 716, 739-40 (2013). In addition to lost income and out-of-pocket expenses, money "[d]amages for nonpecuniary harm" may be awarded for "the consequences of reputational harm" because "[t]he principal element of damages . . . is frequently the disagreeable emotion experienced by the plaintiff[,]" so noneconomic damages offer some "vindication" in the form of "a judgment for 'compensatory' damages that declares publicly that [the plaintiff] has been mistreated and that he was justified in resenting it." Restatement (Second) of Torts § 905 (1977), cmts. c, d. Such damages encompass "that form of mental distress known as humiliation, that is, a feeling of degradation or inferiority or a feeling that other people will regard him with aversion or dislike." *Id.*, cmt. d. *Cf. Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349-50 (1975) (recognizing "that actual injury is not limited to out-of-pocket loss" because "the more customary types of actual harm inflicted by defamatory falsehood include impairment

10

of reputation and standing in the community, personal humiliation, and mental anguish and suffering").

In contrast, when the alleged statement is defamatory per quod because its harmful meaning must be evaluated in context, the plaintiff is required to plead and prove reputational injury. *See M & S Furniture*, 249 Md. at 544; *Samuels*, 135 Md. App. at 549. Although actual economic and punitive damages may be available for defamation per quod, a plaintiff cannot recover presumed damages for noneconomic injuries. *See M & S Furniture*, 249 at 544; *Samuels*, 135 Md. App. at 549-50.

The threshold decision about whether a particular statement is defamatory per se is a question of law for the court. *See Seley-Radtke*, 450 Md. at 483; *Batson v. Shiflett*, 325 Md. 684, 723 (1992). This Court reviews that decision *de novo*, asking whether the motion court was legally correct based on the well-pleaded facts in the complaint and all reasonable inferences drawn from those allegations. *See Davis v. Frostburg Facility Ops., LLC*, 457 Md. 275, 284-85 (2018).

## DISCUSSION

As grounds for reversing the dismissal of his Amended Complaint, Royall invokes what he claims is "the traditional rule" at common law that "calling a person a homosexual is defamatory per se." In his view, the practice of treating a false statement about a private person's sexual orientation as defamatory per se is "binding on this Court" and "remains the law in Maryland—as articulated by Maryland's highest court" in *Wetherby v. Retail*

11

*Credit Co.*, 235 Md. 237, 241 (1964)—because that decision "has never been overruled by Maryland's highest court."

Appellees challenge both the applicability of *Wetherby* and the viability of the rule advocated by Royall.[7] They first contend the Amended Complaint fails to plead sufficient facts to establish publication of the disputed statements. Regarding the defamatory nature of those statements, they argue "the modern consensus is that falsely calling someone gay is not defamatory per se" because that "theory of liability relies upon an outdated belief that homosexuality is, by its very nature, shameful or odious, or worthy of public scorn and approbation." Nor did Royall adequately plead a defamation per quod claim against any of

---

[7] In their brief, Appellees frame the questions presented as follows:

1. In a defamation action, is a complaint subject to dismissal where the plaintiff does not allege publication of the allegedly defamatory comment beyond a small closed group of individuals?

2. Did the Circuit Court err in finding that calling a person by a derogatory slur for a homosexual man, when that person is not homosexual, is not defamatory?

3. Did the Circuit Court err in finding that the Complaint did not allege sufficient facts to support a claim of defamation *per quod*?

4. Did the Circuit Court err in finding that an ambiguous hand gesture, purportedly signaling agreement with the allegedly defamatory statement, could not independently constitute actionable defamation as a matter of law?

5. Did the Circuit Court err in dismissing the tort claims against C&C Meat Sales for failure to sufficiently plead a basis for liability?

the three defendants because "he did not identify what professional opportunities he lost out on because someone used an alleged slur for homosexual men to describe him."

For reasons that follow, we conclude (1) Royall pleaded sufficient facts to establish publication; (2) *Wetherby* does not hold that false statements about sexual orientation are defamatory per se; (3) under Maryland law, false statements about sexual orientation are not defamatory per se; and (4) Royall failed to allege sufficient facts to establish the reputational injury required to plead defamation per quod against any of the Appellees.

### I. The Amended Complaint sufficiently alleges publication of false statements about Royall's sexual orientation.

As a threshold matter, Appellees invite us to decide this appeal on a ground "not raised or decided in the trial court," which is that "Royall did not sufficiently allege publication of the allegedly defamatory comment." Citing *Werber v. Klopfer*, 260 Md. 486, 493, 496 (1971), Appellees contend Royall "did not allege publication of the allegedly defamatory comment beyond a closed universe of three to four people[,]" and that the Amended Complaint does not support a "fair inference . . . that the two to three people who allegedly heard the defamatory comment changed their opinion of Mr. Royall in any way after hearing it, let alone changed their opinion of him because they now understood him to be gay." Given "Royall alleged no publication beyond the walls of the C&C Meat workplace, yet he asserts that he suffers emotional distress (from a conversation he did not personally hear) and that he was denied professional opportunities (by people who were also not present for the conversation in question[,]" Appellees argue the Amended Complaint "pleads no credible nexus between a private workplace exchange among four

discrete people and damages allegedly suffered[.]"

In his reply brief, Royall points out that publication occurs whenever a defamatory statement is "communicated to someone other than the person being defamed[,]" so "mass distribution" of a defamatory statement is not required. Here, he argues, the derogatory statements and gesture were intentionally published to "one or more third parties" with the understanding and intention that information would be "conveyed to a wider audience[,]" causing Royall harm he intended to prove at trial, which included obstacles to his employment prospects. According to Royall, the "immediate and obvious" effect of the disputed statements was that "after working at C&C . . . for four years[,]" he "could not tell a possible future employer to contact Allen Dicks and/or Keith Jewell for a reference."

*Werber* does not support dismissal of Royall's Amended Complaint for lack of publication. In *Werber*, the allegedly defamatory statement accompanied a lampoon, listing a faculty member of Duke University among others whom "dissident" students "had on campus to harangue the student body over the last several years[.]" 260 Md. at 487. This statement was undisputedly circulated by the defendant to fellow alumni association members he "knew personally," four to six others who were "interested generally in the affairs of" the university, and "a few faculty members." *Id*. at 491. At trial, the plaintiff conceded his "reputation was not adversely affected" and offered "no proof of any specific or out-of-pocket damages." *Id*. at 489. After the defendant admitted he "had no knowledge" the plaintiff fit the derogatory descriptors he used in the lampoon (i.e., sex deviate, communist, or advocate of narcotics), the trial judge directed a verdict for the plaintiff and

instructed the jury to award him at least $1 and any punitive damages they determined he was entitled to recover. *Id*.

On appeal from a $5,001 judgment, our Supreme Court reversed on the ground that the defendant's "statement was not libelous" as a matter of law. *See id.* Citing the lack of "evidence that any of the readers of the lampoon," who were "generally well informed people who were also knowledgeable about the campus[,]" would "have understood" it to be defamatory, the Court found "it impossible to believe" readers would not have understood "the inclusion of Klopfer in the list of left wing individuals was merely to identify him as a fellow with leftist leanings, a circumstance which he freely admits." *See id.* at 495, 496.

Because the Supreme Court did not address whether the statement in question was published, but instead focused on whether it was defamatory under the circumstances proved at trial, *Werber* does not support dismissal of Royall's Amended Complaint. Although Royall does not allege he was present for the defamatory statements made by Dicks or the defamatory gesture by Jewell, or otherwise explain how he learned about them, he does allege these statements were made to two of Royall's former co-workers, whom he identifies in the Amended Complaint as Timothy Mobley and Mark Close. At this pleading stage, we are obligated to assume the truth of that averment and to draw inferences that these false statements were made at Royall's former workplace, under circumstances that were public enough for them to be heard by and/or repeated to others, so that Royall eventually learned about them. Even if the Amended Complaint contains scant information about the circumstances in which the allegedly false statements about

15

Royall's sexual orientation were made, we conclude it meets the low threshold to plead publication.

To the extent appellees otherwise rely on *Werber* to contend the false statements about Royall's sexual orientation could not be defamatory because their audience would not have understood them to impugn Royall's heterosexual orientation, we will address in the next three sections why those statements, as pleaded in the Amended Complaint, were not defamatory, either on their face or in the circumstances alleged.

## II. *Wetherby did not decide whether a false statement about a private person's sexual orientation is defamatory per se.*

In his principal challenge to the dismissal of his Amended Complaint, Royall contends the circuit court erred in ruling that neither Dicks' descriptions of him as a "fag," nor Jewell's gesture of agreement, were defamatory per se because this Court is bound by our Supreme Court's decision in *Wetherby v. Retail Credit Co.*, 235 Md. 237 (1964), that such a false statement about sexual orientation is defamatory per se. We do not agree *Wetherby* reaches that question or requires that result.

In *Wetherby*, the two plaintiffs were denied insurance because defamatory statements about their sexual orientation were included in the defendant credit agency's investigative report. *See id.* at 239. They "were turned down by several companies" from whom they sought "life insurance for business purposes" in their "real estate and mortgage business." *See id.* These denials "apparently" occurred "as a result of reports on them which Retail Credit Company had sent insurance companies at the companies' requests." *See id.*

16

After "[i]nvestigators of the credit company interviewed neighbors of the appellants[,]" they

> prepared the reports which suggested that the ladies gave loud and boisterous parties at which there was considerable drinking and, on occasions, 'brawls,' that neighbors have been led to strong suspicions 'of Lesbian action between those women' and said that '[i]nformants will not come out and state that they think the applicant [Wetherby] is 'Lesbian' but hint and hedge around and do everything but state it, saying that they definitely do not act like the feminine sex if they are.'

*Id*. at 239-40.

Before trial, court and counsel agreed this dispute was not over whether the report contained defamatory statements about the plaintiffs' sexual orientation, but whether the defendant had a qualified privilege to publish those statements. It was undisputed "that the libels complained of were all based on reports made by the credit company in the regular course of its business and sent only to its own customers and revealed to no one else" and "that the files containing the results of the investigations leading to the reports and the copies of the reports were kept locked in the credit company's office[,]" from which they were stolen by a man whom the plaintiffs hired to procure them. *Id.* at 239-40. The parties stipulated "that the credit company, as a mercantile rating agency, had a qualified or conditional privilege to fairly publish to its own legitimately interested business customers the information it received in the course of its investigations, without being liable for defamatory matter therein, provided it did not exceed or abuse the privilege[.]"[8] *Id*. at 239.

---

[8] Although our Supreme Court observed parenthetically that "there appears to be a sound basis for this concession by the appellants[,]" the approved concession was not that statements regarding sexual orientation are defamatory per se, but that credit companies

(continued)

17

Significantly, for purposes of that appeal, the issue of whether those statements about the plaintiffs' sexual orientation were defamatory was not disputed or litigated. Instead,

> [t]he case was tried on the premises, understood by the judge and the lawyers for both sides, that there had been sufficient publications, *the statements suggesting that the appellants were Lesbians were libelous per se and that the truth or falsity in fact of the suggestions was not material and not, as such, an issue in the case.* On the question of liability, the case was tried and went to the jury on the narrow issue of whether the credit company had abused or exceeded its qualified privilege.
>
> The testimony adduced on both sides was largely as to the methods employed in making the investigations, the people interviewed, the facts assembled, and the method of reporting these facts to the customers of the credit company.

*Id*. at 239-40 (emphasis added).

Based on this record, the trial judge

> instructed the jury as to publication, as to what constituted defamatory matter (later instructing that to refer to a person as a Lesbian or as having Lesbian tendencies is libelous per se), that there was a qualified privilege in the credit company, and said:
>
> 'And the defendant declares that because of the qualified privilege there has been no libel. That is its defense.
>
> 'So the truth or falsity of the matters contained in those documents, those exhibits, is not in issue. The tru[th] does not have to be proven by [the defendant]; nor does the falsity have to be proven by [the plaintiffs]. You are not to consider truth or falsity whatsoever in this case; it simply is not an issue.

---

have a qualified privilege to publish defamatory statements collected in an investigation, as supported by the cited case law. *See Wetherby v. Retail Credit Co.*, 235 Md. 237, 239 (1964) (citing *Trussell v. Scarlett*, 18 F. 214 (Cir. Ct. D. of Md., Morris, J.); *Petition of Retailers Commercial Agency, Inc.*, 174 N.E.2d 376; Annotation 30 A.L.R.2d 776; *Fresh v. Cutter*, 73 Md. 87; *Simon v. Robinson*, 221 Md. 200).

*Id*. at 240.

The court also instructed the jury that the conditional privilege to publish defamatory matter "may be lost" if its "scope . . . exceeds the exigency of the occasion or reveals more than is necessary for the purpose of the report," or "if the defendant publishes such a report without believing in its truth or without reasonable grounds for believing in its truth[.]" *Id*. Only if jurors concluded the privilege was lost could the defendant credit company be liable, because "'[e]ven if you should find the words themselves were libelous per se, and you found that the defendant used them in the scope of their qualified privilege without any abuse, then you would have to find for the defendant.'" *Id*. at 240-41.

On appeal from the jury's verdict in favor of the defendant credit agency, the sole issue was whether the trial court erred in instructing the jury regarding "the narrow issue of whether the credit company had abused or exceeded its qualified privilege" to publish information received during its investigation. *See id.* Our Supreme Court held the trial judge "did not prejudice the [plaintiffs] in instructing that the truth or falsity of the words claimed to be defamatory was not an issue in the case, particularly since she added that even if the jury found the words were otherwise libelous, they were not actionable if the defendant published them in the exercise of its qualified privilege, without abuse." *Id*. at 244.

*Wetherby* differs from this case in dispositive ways. *First* and foremost, the defamatory nature of those statements about the plaintiffs' sexual orientation was neither contested, nor material, because that "case was tried on the premises, understood by the judge and the lawyers for both sides, that . . . the statements suggesting that the appellants

were Lesbians were libelous per se and that the truth or falsity in fact of the suggestions was not material and not, as such, an issue in the case." *See id.* at 239. Because the false statements about the plaintiffs' sexual orientation undisputedly contributed to the denial of insurance for their business, instead of litigating whether those statements were defamatory, the case "went to the jury on the narrow issue of whether the credit company had abused or exceeded its qualified privilege" to publish such presumptively defamatory statements about plaintiffs' sexual orientation. *See id.* at 239-40. On appeal from the jury's defense verdict, the Supreme Court reviewed only the jury instruction regarding the defendant's qualified privilege to publish false statements about the plaintiffs' sexual orientation. *See id.*

Because neither the trial court, nor the Supreme Court in *Wetherby* was called upon to decide whether those false statements about the plaintiffs' sexual orientation were defamatory per se, *Wetherby* does not establish Maryland precedent on that question. We recognize Royall is not alone in misunderstanding and misapplying *Wetherby*. Although Maryland appellate courts have cited the decision only for its qualified privilege holding,[9]

_____

[9] *Cf. Piscatelli v. Smith*, 424 Md. 294, 307 (2012) (citing *Wetherby* for the proposition that "[i]n some circumstances, an absolute or qualified privilege defeats a claim of defamation, if the defendant did not abuse that privilege."); *Hanrahan v. Kelly*, 269 Md. 21, 29-30 (1973) (citing *Wetherby* for the proposition that "[a]bsent a finding of express malice, a conditional privilege, if not abused, defeats the libel action."); *Orrison v. Vance*, 262 Md. 285, 292 (1971) (citing *Wetherby* in support, "That some words need saying is a notion which has ancient validity but the qualified privilege which usually attends their saying must be exercised in a reasonable manner and for a proper purpose"); *Montgomery Investigative Servs., Ltd. v. Horne*, 173 Md. App. 193, 206 (2007) (recognizing that the qualified privilege to publish defamatory information as part of an investigative report was stipulated in *Wetherby*, then deciding that "[t]he *Wetherby v. Retail Credit* dictum is now

(continued)

other courts and commentators have relied on it for the mistaken proposition that under Maryland law, false statements about a private person's sexual orientation are defamatory per se.[10]

a holding" so that "the legitimate business interest that Southern Services had in checking up on the criminal background of its employee paralleled the reciprocal interest that MIS had in providing, for a fee, such background information to Southern Services"); *Int'l Bh'd of Elec. Workers, Loc. 1805, AFL-CIO v. Mayo*, 35 Md. App. 169, 178 (citing *Wetherby* in concluding there was "no reversible error in the instructions relating to qualified privilege"), *aff'd on other grounds*, 281 Md. 475 (1977).

[10] *See, e.g., Nazeri v. Missouri Valley Coll.*, 860 S.W.2d 303, 312 (Mo. 1993) (citing *Wetherby* for the proposition that "[s]ome [courts] have held that an allegation of homosexuality is defamatory per se, in that it implies immorality, unchastity, or criminal conduct"); Patricia C. Knussman, *Imputation of Homosexuality as Defamation*, 7 A.L.R.6th 135 § 3 (2005 and 2025 Cum. Supp.) (citing *Wetherby* among cases in which "the courts, either directly or implicitly, expressed the view that an imputation of homosexuality is defamatory per se, and consequently damages are presumed"); Thomas D. Selz, Melvin Simensky, Patricia Acton, Robert LindSlander, 1 *Entertainment Law 3d: Legal Concepts and Business Practices* § 11:35 n.5 (West) (Dec. 2025 update) (citing *Wetherby* as aligned with courts treating "an imputation of homosexuality" as defamatory under an "imputation of unchastity" or "serious sexual misconduct" theory); Holly Miller, *Homosexuality as Defamation: A Proposal for the Use of the "Right-Thinking Minds" Approach in the Development of Modern Jurisprudence*, 18 Comm. L. & Pol'y 349, 357-58 & n.59 (2013) (citing *Wetherby* as "holding falsely labeling someone as lesbian is libelous per se" and among decisions that have "held the misidentification of someone as homosexual to be defamatory per se because it implied unchastity[,]" as support for the proposition that some courts "have expanded this category to include allegations of female homosexual acts"); Anthony Michael Kreis, *Lawrence Meets Libel: Squaring Constitutional Norms With Sexual-Orientation Defamation*, 122 Yale L. J. Online 125, n.9 (citing *Wetherby* among jurisdictions where "false allegations of nonheterosexuality are still actionable" as per se defamation); Matthew D. Bunker, et. al., *Not That There's Anything Wrong with That: Imputations of Homosexuality and the Normative Structure of Defamation Law*, 21 Fordham Intell. Prop. Media & Ent. L.J. 581, 609 n.32 (2011) (citing *Wetherby* among cases in which "courts have applied defamation per se").

To the extent *Wetherby* has been viewed as precedent for treating false statements about sexual orientation as defamatory per se, we correct that misinterpretation. In turn, because there is no Maryland precedent on this question, we address it next.[11]

### III. Under Maryland law, a false statement about a private person's sexual orientation is not defamatory per se.

Royall's mistaken reliance on *Wetherby* rests on the factual premise we examine next—the "injurious character" of false statements about sexual orientation is a "self-evident fact of common knowledge" because misidentifying a private person as non-heterosexual inevitably has negative consequences for that individual's reputation. *See M&S Furniture Sales*, 249 Md. at 544. Simply stated, Royall argues false statements about sexual orientation are so patently harmful to an individual's reputation that Maryland courts should not require that individual to plead or prove that injury.

Appellees, pointing to significant legal and cultural changes shaping our common experience around sexual orientation, contend Royall's "theory of liability relies upon an outdated belief that homosexuality is, by its very nature, shameful or odious, or worthy of public scorn and approbation." Appellees ask us, instead, to follow "the modern consensus"

---

[11] We recognize that in *Thomas v. BET Sound-Stage Restaurant/BrettCo., Inc.*, 61 F. Supp. 2d 448, 457 (D. Md. 1999)—a Maryland federal court, without citing to *Wetherby* or any other Maryland decision—held that oral statements made by a restaurant employee's boss to her co-worker, falsely stating that she was a lesbian after she spurned his sexual advances and assaults, stated both a federal claim for sexual harassment and a state claim for defamation per se against the boss and the restaurant. Citing only to Minnesota and Ohio cases for that proposition, the federal court concluded the false statements about her sexual orientation would "expose plaintiff to contempt, even in today's society" and "establish[ed] a prima facie case" against both the manager and the restaurant, "since an employer may be held vicariously liable for defamatory falsehoods made by its employees." *Id*.

22

among other courts and legal commentators that "[f]alsely being called a homosexual is simply not the reprehensible or scandalous assertion it may have been in the past[,]"so "falsely calling someone gay is not defamatory per se."

In Appellees' view, treating false statements about sexual orientation as defamatory per se would be inconsistent with decisions and rationales in landmark United States Supreme Court cases such as: *Lawrence v. Texas*, 539 U.S. 558, 578 (2003); *United States v. Windsor*, 570 U.S. 744, 774 (2013); and *Obergefell v. Hodges*, 576 U.S. 644, 681 (2015), which collectively establish that "members of the LGBTQ+ community deserve 'equal dignity in the eyes of the law.'" Acknowledging the lack of Maryland precedent, Appellees cite persuasive reasoning by other courts that have compared this evolution in legal and community standards surrounding sexual orientation to "the historical treatment of race in defamation law[,]" pointing out

> that, as late as 1957, it was defamatory to falsely identify a White person as Black, but it was not defamatory to falsely identify a Black person as White. . . . because White people enjoyed such enhanced social status that a person could only benefit from being mistakenly thought of as White – but being Black was so inherently demeaning and degrading that a White person most certainly suffered reputational and personal harm under that misidentification.

*See Albright v. Morton*, 321 F. Supp.2d 130, 138-39 (D. Mass. 2004).

Appellees also argue the "bright line that Mr. Royall seeks to enforce against homosexuals as a class of people" amounts to a "judicial imprimatur" for prejudice and mistreatment that is "outdated" and has "no place in modern jurisprudence as a foundation for a defamation suit." *Cf. id.* at 138 ("If this Court were to agree that calling someone a homosexual is defamatory per se," that "would, in effect, validate that sentiment and

23

legitimize relegating homosexuals to second-class status."). "Allowing Mr. Royall's claim to go to trial[,]" they argue, "would ratify the outdated notion that homosexuals exist at the bottom of a caste system in the United States (or at least in Maryland)."

In reply, Royall disputes that "attitudes about someone identified as . . . other than heterosexual have 'changed[,]'" pointing out that the "United States Supreme Court Associate Justice Samuel Alito sold shares of beer giant Anheuser-Busch INBEV as conservatives were ditching the BUD LIGHT brewer over its partnership with a transgender social media influencer[,]" as evidence that "peoples all over these United States are listening" to his "'Mega Phone.'" In addition, he cites "Trump's transgender ban . . . in the United States Military" and predicts "Men and Women serving in the U.S. Military that are perceived to be Homosexual" will be "force[d] . . . to leave."

As we have explained, a false statement is defamatory per se when the reputational damage from that statement "needs no explanation" because its "injurious character is a self-evident fact of common knowledge of which the court takes judicial notice[.]" *M&S Furniture,* 249 Md. at 544; *Samuels*, 135 Md. App. at 549. Only in such circumstances do "the words themselves impute the defamatory character" so that "no innuendo—no allegation or proof of extrinsic facts—is necessary[.]" *Indep. Newspapers*, 407 Md. at 441 (cleaned up).

The statements that are easiest to classify as presumptively defamatory are ones that falsely impute the commission of a crime. *See, e.g., Caldor, Inc. v. Bowden*, 330 Md. 632 (1993) (false accusation of theft against employee); *Montgomery Ward & Co., Inc. v. Cliser*, 267 Md. 406 (1972) (false accusation of theft against customer); *Simon v. Robinson*,

24

221 Md. 200 (1959) (false allegation plaintiff fraudulently diverted and converted funds for his own personal use); *Lewis v. Accelerated Transp.-Pony Express, Inc.*, 219 Md. 252, 254 (1959) (false statement that plaintiff's truck stop was "nothing but a whorehouse"); *Haines v. Campbell*, 74 Md. 158 (1891) (false allegation of arson); *Padgett v. Sweeting*, 65 Md. 404 (1886) (false allegation of perjury). Other false statements commonly considered defamatory per se are those imputing the subject is diseased; unfit for his or her profession, trade, or business; or has committed "serious sexual misconduct." *See* Restatement (Second) of Torts §§ 570, 574 (1977); 1 D. Elder, *Defamation: A Lawyer's Guide* §§ 1:15 – 1:18 (Dec. 2025 update).

Maryland courts have held a range of false statements disparaging a person in a manner that negatively affects his or her employability or community reputation to be defamatory per se. In many cases, there is overlap, such as when the statement concerns criminal behavior or incompetent work. For example, this Court has recognized as defamatory per se a statement by a stadium vendor that an usher "is a thief[,]" *Carter v. Aramark Sports & Ent. Svcs., Inc.*, 153 Md. App. 210, 238 (2003); a college president's statement that a professor was discharged for "poor performance[,]" *Samuels*, 135 Md. App. at 544, 550; and a union agent's statement insinuating that a union member "was untrustworthy and not a fit person to perform the type of work in which he specialized; that is, the installation of safes, bank vaults, safe deposit boxes, and other similar items." *Nistico v. Mosler Safe Co.*, 43 Md. App. 361, 367 (1979). Likewise, a law firm principal's statements regarding a discharged attorney were defamatory per se because they "impute[d] . . . incapacity or lack of due qualification" that "would disqualify him or render

25

him less fit for the practice of law." *Shapiro*, 105 Md. App. at 775, 777 (citations and quotation marks omitted). Similarly, statements to a national database regarding a physician's "substandard care" resulting in patient safety risks could be defamatory per se because they impugned his professional competence. *See Adventist Healthcare, Inc. v. Behram*, 488 Md. 410, 429 n.13 (2024) (affirming this Court's uncontested decision that such allegedly false statements were defamatory per se).

The premise supporting classification of these false statements as defamatory per se is that the resulting harm to reputation is so inevitable and apparent that courts should not require the plaintiff to plead and prove the actual injury. For example, false statements imputing child abuse are defamatory per se because that "is the kind of allegation that would expose the person about whom it was spoken to widespread scorn, hatred, and contempt." *Helsinki v. Rosenberg*, 90 Md. App. 158, 165, *rev'd on other grounds*, 328 Md. 664, 675 (1992) (affirming psychologist defamed plaintiff by "brand[ing him] as a man who committed an act reviled by society, which also constitutes a felony[,]" but her testimony was privileged both in court and when repeated to journalists outside courtroom).

Although statements falsely alleging sexual misconduct historically have been treated as defamatory per se, changes in our common experiences surrounding what behavior qualifies as presumptively harmful have notably shrunk this category.[12] For example, although statements imputing "unchastity" used to be defamatory per se –

___

[12] *See* Elder, *supra*, § 1:17; Restatement (Second) Torts § 574-75 cmts. b, c; Daniel L. Stephens, *The Evolution and Confusion of the Sexual Misconduct Category of Slander Per Se*, 31 Regent U. L. Rev. 277, 281-89 (2019).

26

typically only when directed at a female – courts no longer follow that gender-specific view.[13] Nevertheless, this provision of the Restatement recognizes that falsely imputing "homosexuality to either a woman or a man" may be treated as defamatory per se sexual misconduct, but acknowledges a split in the case law and adopts a "remains to be seen" position.[14]

Whether courts should treat statements falsely imputing that an individual is gay as defamatory per se is a question of law that necessarily reflects our evolving common experiences. *See M&S Furniture*, 249 Md. at 544. Based on our current legal and social climate, we conclude that misstating sexual orientation is not defamatory per se because, absent specific circumstances pleaded in the complaint, such statements are not so self-evidently harmful to the reputation of a non-public figure that courts should excuse the need to plead and prove reputational injury.

During the 62 years since *Wetherby*, profound changes in the legal landscape reflect widespread effort toward establishing what the United States Supreme Court has described as "equal dignity in the eyes of the law" without regard to sexual orientation. *See Obergefell v. Hodges*, 576 U.S. 644, 681 (2015). Significantly, after the Supreme Court ruled in

---

[13] *See* Elder, *supra*, § 1:17 & n.7; Restatement (Second) Torts § 574 cmt. c.; Stephens, *supra*, 31 Regent U. L. Rev. at 281-99.

[14] *See* Restatement (Second) Torts § 74 cmt. c. *See generally* Stephens, *supra*, 31 Regent U. L. Rev. at 289-91 (reviewing "controversial" history of including "homosexual conduct" in sexual misconduct category of defamation per se). *See also* 1 D. Elder, *Defamation: A Lawyer's Guide* § 1:17 & n.20 (Dec. 2025 update) (collecting cases "[c]ompar[ing] the so-called 'modern view' declining to find statements imputing homosexuality slanderous per se"). See *infra* note 26

27

*Lawrence v. Texas*, 539 U.S. 558, 578-79 (2003), that consensual sexual activity between same-sex adults is constitutionally protected, false statements about an individual's sexual orientation no longer present the risk of reputational injury that accompanies criminal activity.[15] There is a common premise underlying that decision to decriminalize consensual sex between same-sex adults, and the Supreme Court's ensuing decisions in *Windsor*, 570 U.S. at 772, concluding that Congress cannot constitutionally enact laws that deny same-sex couples the protections and benefits of their state-sanctioned marriages; *Obergefell*, 576 U.S. at 660-61, holding that same-sex couples must be permitted to marry "on the same terms as accorded to couples of the opposite sex"; and *Pavan v. Smith*, 582 U.S. 563, 567 (2017), ruling that states may not use birth certificate laws giving "married parents a form of legal recognition that is not available to unmarried parents" to "deny married same-sex couples that recognition." Foundational to each of these decisions is that sexual orientation is not grounds for courts, legislatures, or executives to treat individuals differently in their exercise of these fundamental rights.[16]

Although none of those decisions directly affect defamation law, they reflect what the United States Supreme Court has recognized were "substantial cultural and political

---

[15] *See, e.g.,* Md. Code § 3-321 of the Criminal Law Code ("The common law crime of sodomy has been repealed.").

[16] *See also Romer v. Evans*, 517 U.S. 620, 632-33 (1996) (striking down Colorado's constitutional amendment prohibiting "all legislative, executive, or judicial action at any level of state or local government designed to protect . . . homosexual persons or gays and lesbians[,]" because  states cannot "impose a broad and undifferentiated disability on a single named group" based on "animus" predicated on sexual orientation).

developments" during "the late 20th century[,]" which were then "followed by a quite extensive discussion . . . in both governmental and private sectors and by a shift in public attitudes toward greater tolerance[,]" which, in turn, led "questions about the rights of gays and lesbians" to "reach[] the courts, where the issue could be discussed in the formal discourse of the law." *Obergefell*, 576 U.S. at 661, 135 S. Ct. 2596. Evolving social attitudes toward sexual orientation are evident in the resulting legal changes.[17]

For example, as the *Lawrence* majority observed in 2003, "[o]ver the course of the last decades, States with same-sex prohibitions have moved toward abolishing them." 539 U.S. 558, 570 (2003). In her concurring opinion, Justice O'Connor specifically pointed to Texas's presumption that "calling a person a homosexual is slander per se because the word 'homosexual' 'impute[s] the commission of a crime[,]'" as one of the negative consequences to reputation that should and would be eliminated by the decriminalization of sexual activity between same-sex adults. *See id.* at 583-84 (2003) (O'Connor, J., concurring).

As these landmark decisions illuminate, the outcome of widespread discourse about sexual orientation has been profound,[18] leading to legislative and judicial protections at

---

[17] *See generally* Elizabeth B. Cooper, *The Power of Dignity*, 84 Fordham L. Rev. 3 (2015) (examining the role of dignity beginning with *Romer v. Evans*, when the Supreme "Court began a different path . . . that saw and rejected the legal stigmatization of LGB people, and one that recognized and enhanced our dignity").

[18] *See generally* Stephens, *supra*, 31 Regent U. L. Rev. at 294-95 & n.161 (reviewing changes in "public[] opinion of homosexuality" that supported legal decisions declining to treat false statements about sexual orientation as defamatory per se).

both the federal and state level, against disparate treatment in a broad range of core community defining experiences, from marriage,[19] to employment,[20] to accommodations,[21] among others.

---

[19] *See generally Obergefell*, 576 U.S. at 671-72 ("The right to marry is fundamental as a matter of history and tradition, but rights come not from ancient sources alone. They rise, too, from a better informed understanding of how constitutional imperatives define a liberty that remains urgent in our own era. . . . The right of same-sex couples to marry that is part of the liberty promised by the Fourteenth Amendment is derived, too, from that Amendment's guarantee of the equal protection of the laws."); Md. Code §§ 2-201, 2-202 of the Family Law Article (providing that marriages between individuals who are not prohibited by statute from marrying are valid).

[20] *See, e.g.*, *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 140 S. Ct. 1731, 1744 (2020) (holding that under Title VII of the Civil Rights Act of 1964, "[a]n individual's homosexuality or transgender status is not relevant to employment decisions"); Md. Code, § 20-602(1)-(2) of the State Gov't Article ("SG") ("It is the policy of the State, in the exercise of its police power for the protection of the public safety, public health, and general welfare, for the maintenance of business and good government, and for the promotion of the State's trade, commerce, and manufacturers: (1) to assure all persons equal opportunity in receiving employment and in all labor management-union relations, regardless of . . . sexual orientation . . . and (2) to that end, to prohibit discrimination in employment by any person."). *See also* Md. Code § 6-104(b) of Educ. Article (prohibiting sexual orientation discrimination against public school employees); Md. Code § 13-219(c) of State Fin. & Proc. Article (prohibiting sexual orientation discrimination in public procurement); Md. Code of Fair Employment Practices, COMAR § 01.01.2007.16, Art. I(A) (prohibiting sexual orientation discrimination in employment of executive branch personnel).

[21] *See, e.g.*, SG § 20-304 ("An owner or operator of a place of public accommodation or an agent or employee of the owner or operator may not refuse, withhold from, or deny to any person any of the accommodations, advantages, facilities, or privileges of the place of public accommodation because of the person's . . . sexual orientation"); SG § 20-702(a)(1) ("It is the policy of the State . . . to provide for fair housing throughout the State to all, regardless of . . . sexual orientation" and "to prohibit discriminatory practices with respect to residential housing by any person, in order to protect and ensure the peace, health, safety, prosperity, and general welfare of all").

In Maryland, this path away from treating sexual orientation as grounds for differentiating, denying, and denigrating is a matter of public record and public policy. Thirteen years ago—and nearly three years before the United States Supreme Court ruled in *Obergefell* that the right to same-sex marriage is protected by the United States Constitution—Maryland voters and legislators were already leading the way toward "equal dignity in the eyes of the law." *See Obergefell*, 576 U.S. at 681. As Justice Scalia later pointed out, Maryland voters, "by a popular vote, 52% to 48%, on November 6, 2012" approved a ballot referendum establishing "Maryland's civil marriage laws allow gay and lesbian couples to obtain a civil marriage license[.]" *Windsor*, 570 U.S. at 801 (Scalia, J., dissenting). Within months, our General Assembly had codified that right in this State. *See* 2013 Md. Laws Ch. 2 (H.B. 438), *codified at* Md. Code § 2-201(b) of the Family Law Article.

The arc of community-wide change continues to broaden protections for expressions of sexual orientation. Where our laws were silent, our General Assembly has added explicit language articulating public policy promoting equal treatment without regard to sexual orientation. *See, e.g., supra* notes 24, 25. A recent example occurred when—with overwhelming support in both the House of Delegates and Senate—the Maryland Equal Pay for Equal Work Act, was amended to add "sexual orientation" to the list of specific prohibitions against discrimination in wage payment and employment

opportunities.[22] *See* Md. Code, § 3-304(b)(1) of the Labor & Employment Article ("An employer may not discriminate between employees in any occupation" based on "sexual orientation," either in the payment of wages or in providing "employment opportunities").

The case before us is not the first time Maryland courts have been asked to recognize that changes in our interpretation of the law go hand-in-hand with changes in our community. A decade ago, Maryland's Supreme Court expressly found, "[a]s reflected by these legal protections against discrimination on the basis of sexual orientation" that we are recounting here, "our 'common experience' has evolved as a result of public and private anti-discrimination measures reflecting current attitudes." *Conover v. Conover*, 450 Md. 51, 77 (2016). Overruling Maryland caselaw precedent "undermined by subsequent events," in order to approve the application of de facto parenthood concepts to families with same-sex parents, our Supreme Court pointed to changing community attitudes about sexual orientation:

> Our state's recognition of same-sex marriage illustrates the greater acceptance of gays and lesbians in the family unit in society. *See also* Melina Constantine Bell, *Gender Essentialism and American Law: Why and How to Sever the Connection*, 23 Duke J. Gender L. & Pol'y 163, 200 (2016) ("[G]ay men and lesbians, and same-sex couples are gaining greater acceptance in the U.S."); Elizabeth S. Scott & Robert E. Scott, *From Contract to Status: Collaboration and the Evolution of Novel Family Relationships*, 115 Colum.

---

[22] During the next legislative session after our Supreme Court concluded in *Doe v. Cath. Relief Servs.*, 484 Md. 640, 678 (2023), that the prior language of this statute did not encompass violations predicated on sexual orientation, the General Assembly amended it to add "sexual orientation" to the list of prohibitions on discrimination in wage payment and employment opportunities. *See* Md. Laws 2024, ch. 131 (Maryland Senate Roll Call Vote, 2024 Session, House Bill 1397, April 8, 2024, recorded votes 44 Yeas, 0 Nays, 3 Not Voting; Maryland House Roll Call Vote, 2024 Session, House Bill 1397, April 8, 2024, recorded votes 122 Yeas, 11 Nays, 5 Not Voting).

L. Rev. 293, 374 (2015) (reviewing the "dramatic change in public attitudes . . . for same-sex couples who wish to marry").

*Conover*, 450 Md. at 77-78.

More recent appellate decisions have prohibited the use of harmful sexual orientation stereotypes in criminal prosecutions. In *Vangorder v. State*, 266 Md. App. 1, 27 (2025), this Court held "evidence of sexual orientation is irrelevant in child sexual abuse cases when the child is pre-adolescent and when, as [in that case,] there is no evidence linking sexual orientation with child abuse[.]" In doing so, we followed *Turenne v. State*, 488 Md. 239 (2024), pointing out that "every member of Maryland's Supreme Court agreed to the proposition, albeit in dicta, that evidence of an adult defendant's sexual orientation either is not relevant to a defendant's sexual attraction to children or that the risk of unfairly prejudicing a defendant by reinforcing a stereotype of gay and lesbian people outweighs any potential probative value such evidence might have." *See Vangorder*, 266 Md. App. at 19-20 (citing *Turenne*, 488 Md. at 274 n.16) (recognizing that "where the defendant is gay or lesbian and is of the same gender as the alleged victim, an attempt to make such a connection is particularly concerning, because it 'could be misinterpreted' as 'reinforc[ing] a terrible stereotype of gay and lesbian people' and 'perpetrating a pernicious falsehood about same-sex orientation'") (quoting *Turenne v. State*, 258 Md. App. 224, 264 (2023)). Both decisions, rejecting attempts to link sexual orientation to criminal behavior, reflect the Maryland judiciary's responsibility to ensure "equal dignity in the eyes of the law." *See Obergefell*, 576 U.S. at 681.

Other state courts that have decided not to treat a false statement about sexual orientation as defamatory per se persuasively point to both these shifting attitudes and the role that courts play in recognizing and implementing such change.[23] The consensus among these courts, as well as legal commentators,[24] is that false statements about sexual

---

[23] *See generally* Patricia C. Kussmann, *Imputation of Homosexuality as Defamation*, 7 A.L.R.6th 135 (2005 & 2025 Cum. Supp.) (collecting cases deciding whether "a false imputation of homosexuality is defamatory per se"). *Cf. Albright v. Morton*, 321 F. Supp.2d 130, 137 (D. Mass. 2004), (examining legal history of defamation per se based on imputation of homosexuality), *aff'd on other grounds*, *Amrak Prods., Inc. v. Morton*, 410 F.2d 69 (1st Cir. 2005). *Cf. also Laguerre v. Maurice*, 138 N.Y.S.3d 123, 130 (N.Y. App. Div. 2020) (concluding that precedent "that the false imputation of homosexuality constitutes a category of defamation per se [was] inconsistent with current public policy" as reflected in the "profound and notable transformation of cultural attitudes and governmental protective laws" resulting in "a veritable sea change in social attitudes about homosexuality," as reflecting in *Lawrence* and *Obergefell* decisions); *Donovan v. Fiumara*, 442 S.E.2d 573, 580 (N.C. App. 1994) (holding that "we are unable to rule the bare allegation that an individual is 'gay' or 'bisexual' constitutes today an accusation which, as a matter of law and absent any 'extrinsic, explanatory facts,' per se holds that individual up to 'disgrace, ridicule or contempt'"); *Hayes v. Smith*, 832 P.2 1022, 1026 (Colo. App. 1991) (holding that "false statements concerning homosexuality are not slander per se even though they arise in an employment context and are directed at plaintiff's business reputation" due to changing times); *Boehm v. Am. Bankers Ins. Grp., Inc.*, 557 So. 2d 91, 94-95 (Fla. Dist. Ct. App. 1990) (noting "[t]he modern view considering the issue, has not found statements regarding sexual preference to constitute slander per se, let alone intrinsic evidence of express malice"); *Key v. Ohio Dep't of Rehab. & Corr.*, 62 Ohio Misc. 2d 242, 246 (Ohio Ct. Cl. 1990) (holding that epithet "fag" was not defamatory per se "in view of the changing temper of the times" but might be actionable per quod); *Moricoli v. Schwartz*, 361 N.E.2d 74, 76 (Ill. App. 1977) (holding that statements referring to nightclub singer as "fag" were not actionable without pleading and proof of special damages, because homosexuality was not a crime and no longer presumptively harmful "in view of the changing temper of the times").

[24] *See, e.g.*, Geoffrey Christopher Rapp, *LGBTQ+ Rights, Anti-Homophobia and Tort Law Five Years After Obergefell*, 2022 U. Ill. L. Rev. 1103, 1127 (2022) (arguing that when evaluating whether "being called 'gay' or a 'lesbian' is defamatory because of community attitudes, [courts] are presented with an opportunity . . . to describe those attitudes as inconsistent with antidiscrimination principles of a state's public policy goals

(continued)

of equality for the members of the LGBTQ+ community"); Clay Calvert, et al., *Defamation Per Se and Transgender Status: When Macro-Level Value Judgments About Equality Trump Micro-Level Reputational Injury*, 85 Tenn. L. Rev. 1029, 1057 (2018) (recognizing that "many scholars have advocated for eliminating defamatory per se status for false allegations of homosexuality. Yet . . . other scholars--albeit writing more than a half-decade ago--have cautioned against this change"); Ashley Milsovic, *The Tides of Transgressions: An Analysis of Defamation and the Rights of the LGBT Community*, 82 Alb. L. Rev. 323, 323 (2019) (recognizing "an apparent and ever-growing trend of acceptance of the LGBT community . . . in present-day American society[,]" but that "discrimination remains a pervasive threat" and advocating for reform of the historical rule recognizing that "[f]alse accusations of homosexuality" constitutes "grounds for defamation" so "that the best solution is allowing this cause of action to continue under defamation per quod as opposed to defamation per se"); Courtney G. Joslin, et al., *The Restatement of Gay(?)*, 79 Brook. L. Rev. 621, 658, 661 (2014) ("Consistent with the way the law has evolved with regard to race and ethnicity, the drafters could clarify that false imputations that a person is LGBT should no longer be considered defamatory" because "a determination that sexual-orientation defamation cannot be actionable would be a substantial step toward recognizing the dignity of the LGBT community."); Jay Barth, *Is False Imputation of Being Gay, Lesbian, or Bisexual Still Defamatory? The Arkansas Case*, 34 U. Ark. Little Rock L. Rev. 527, 548 (2012) ("argu[ing] that there is no continuing justification for deeming false imputation of an individual as being gay, lesbian, or bisexual defamatory even in locales where 'community standards' exhibit sharply negative attitudes about LGB individuals" because "gay defamation cases serve only as state-driven perpetuation of denigration of sexual minorities in direct conflict with the trajectory of American law regarding sexual orientation"); Abigail A. Rury, *He's So Gay . . . Not That There's Anything Wrong with That: Using a Community Standard to Homogenize the Measure of Reputational Damage in Homosexual Defamation Cases*, 17 Cardozo J. L. & Gender 655, 657 (2011) (advocating for changes in community standards used to evaluate homosexual defamation cases); Haven Ward, *I'm Not Gay, M'Kay?: Should Falsely Calling Someone a Homosexual be Defamatory?*, 44 Ga. L. Rev. 739, 742 (2010) (raising concern that courts are enforcing homophobia by treating false allegations about sexual orientation as defamatory per se); Robert D. Richards, *Gay Labeling and Defamation Law: Have Attitudes Toward Homosexuality Changed Enough to Modify Reputational Torts?*, 18 Commlaw Conspectus 349, 355, 356, 364-65 (2010) (advocating that because rights are still contested, false attributions of homosexuality should still be grounds for defamation); Eric K. M. Yatar, *Defamation, Privacy, and the Changing Social Status of Homosexuality: Re-Thinking Supreme Court Gay Rights Jurisprudence*, 12 Law & Sexuality 119, 157-58 (2003) (recognizing defamation law affords compensation in communities that do not accept homosexuality); Randy M. Fogle, *Is Calling Someone "Gay" Defamatory?: The Meaning of Reputation, Community More, Gay Rights, and Free Speech*, 3 Law & Sexuality 165, 196 (1993) (recognizing that "the concept of reputation as dignity is . . . reflected in a jurisdiction's laws reflecting gay and lesbian rights").

orientation are not so inevitably injurious that the resulting reputational damage is "a self-evident fact of common knowledge" justifying a per se presumption relieving that plaintiff from the burden of pleading and proving a defamation injury. *See M&S Furniture Sales*, 249 Md. at 544.

As one of our fellow appellate courts observed in an eloquent and oft-cited analysis of arguments like those now before us, "the defamatory tendency of a statement depends 'upon the temper of the times [and] the current of contemporary public opinion,'" so "a statement that is 'harmless in one age . . . may be highly damaging to reputation at another time[,]'" and vice versa. *Yonaty v. Mincolla*, 97 A.D.3d 141, 945 N.Y.S.2d 774, 777 (N.Y. App. Div. 2012). Rejecting dicta from prior cases suggesting "statements falsely imputing homosexuality" were defamatory per se, the New York court held such "decisions are inconsistent with current public policy and should no longer be followed." *Id*. We find this ruling and rationale persuasive:

> Defamation "necessarily . . . involves the idea of disgrace[.]" Defendant and amici argue—correctly, in our view—that . . . cases categorizing statements that falsely impute homosexuality as defamatory per se are based upon the flawed premise that it is shameful and disgraceful to be described as lesbian, gay or bisexual. In fact, such a rule necessarily equates individuals who are lesbian, gay or bisexual with those who have committed a "serious crime"— one of the four established per se categories[.]
>
> That premise is inconsistent with the reasoning underlying the decision of the Supreme Court of the United States in *Lawrence v. Texas*, in which the Court held that laws criminalizing homosexual conduct violate the Due Process Clause of the Fourteenth Amendment of the United States Constitution. The Court stated that people who are homosexual "are entitled to respect for their private lives" but "[w]hen homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination in both the public and in the private spheres." These statements of the Supreme Court simply

36

cannot be reconciled with . . . cases concluding that being described as lesbian, gay or bisexual is so self-evidently injurious that the law will presume that pecuniary damages have resulted. . . .

[W]e locate "the public policy of [this] state in the law as expressed in statute and judicial decision and also [by] consider[ing] the prevailing attitudes of the community[.]" Rather than countenancing the view that homosexuality is disgraceful, [New York's] Human Rights Law, since 2002, has expressly prohibited discrimination based on sexual orientation in employment, public accommodations, credit, education and housing. Most revealing of the respect that the people of this state currently extend to lesbians, gays and bisexuals, the Legislature passed the Marriage Equality Act in June 2011, which . . . gave same-sex couples the right to marry in New York, thereby granting them all the benefits of marriage, including "the symbolic benefit, or moral satisfaction, of seeing their relationships recognized by the State[.]" . . .

We note that the most recent Appellate Division decision considering the issue in depth was decided nearly 30 years ago. . . . In light of the tremendous evolution in social attitudes regarding homosexuality, the elimination of the legal sanctions that troubled the Second Department in 1984 and the considerable legal protection and respect that the law of this state now accords lesbians, gays and bisexuals, it cannot be said that current public opinion supports a rule that would equate statements imputing homosexuality with accusations of serious criminal conduct or insinuations that an individual has a loathsome disease[.] While lesbians, gays and bisexuals have historically faced discrimination and such prejudice has not been completely eradicated, "the fact of such prejudice on the part of some does not warrant a judicial holding that gays and lesbians [and bisexuals], merely because of their sexual orientation, belong in the same class as criminals[.]"

*Id.* at 777-78 (citations omitted).

Crediting the evolution of "our 'common experience,'" evidenced by the growing number and scope of "legal protections against discrimination on the basis of sexual orientation[,]" *Conover*, 450 Md. at 77, we conclude false statements about sexual orientation are not defamatory per se. Misstating a private person's sexual orientation does not presumptively demean that person by suggesting he or she is deserving of social

37

approbation. Nor is a non-heterosexual orientation so presumptively shameful, disgraceful, or harmful in our current legal and cultural climate that courts should excuse a defamation plaintiff from pleading and proving actual reputational injuries. As another leading court that rejected a per se premise for sexual orientation defamation claims emphasized,

> [w]hat has not changed in the case law is the conclusion that the category "defamation per se" should be reserved for statements linking an individual to the category of persons "deserving of social approbation" like a "thief, murderer, prostitute, etc." To suggest that homosexuals should be put into this classification is nothing short of outrageous.

*Albright v. Morton*, 321 F. Supp. 2d 130, 139 (D. Mass. 2004), *aff'd on other grounds sub nom. Amrak Prods., Inc. v. Morton*, 410 F.3d 69 (1st Cir. 2005).

This Court declines to perpetuate the prejudice animating a presumption that misstating a person's sexual orientation injures his, her, or their reputation. Mindful that defamation per se is a common law concept, which is court-created and court-implemented, we recognize that under Maryland Rule 18-102.3(b), "[i]n the performance of judicial duties, a judge shall not, by words or conduct, manifest bias, prejudice, or harassment based upon . . . sexual orientation" and "shall require attorneys in proceedings before the court, court staff, court officials, and others subject to the judge's direction and control to refrain from similar conduct."

Treating false statements about sexual orientation as defamatory per se would contradict both the letter and the spirit of Rule 18-102.3(b), by rewarding the biases and prejudices of litigants seeking to substitute a defamation per se presumption for pleading and proof of reputational injury. Doing so would have the demeaning and divisive effect Marylanders have sought to avoid in removing sexual orientation as a factor in the many

38

aspects of our criminal and civil law that reach far beyond what we have surveyed here. Although we acknowledge some "segment of the community" may continue to denigrate individuals who are not heterosexual, we agree "courts should not, directly or indirectly, give effect to these prejudices" by opening the courthouse doors to defamation per se claims like the one before us, which is predicated on this plaintiff's prejudicial presumption that being misidentified as gay so harmed his reputation that he should not be required to plead and prove his injuries. *See Albright*, 321 F. Supp. 2d at 137-38 (citing *Goodridge v. Dep't of Public Health*, 798 N.E. 2d 941 (Mass. 2003)).

Ultimately, we conclude treating a false statement about sexual orientation as defamation per se rests on a factual premise that Maryland courts reject and requires a judicial role Maryland courts decline to play. No matter how many more steps still lie ahead along our judicial journey toward ensuring that litigants in Maryland are treated with equal dignity under the law, adopting a common law presumption that false statements about sexual orientation are defamatory per se would be a misguided step backward.

For these reasons, we hold that under Maryland law, a false statement about the sexual orientation of a person is not defamatory per se. In turn, the motion court did not err in ruling Royall's Amended Complaint does not plead a claim for defamation per se.

## IV.     *The Amended Complaint does not state a claim for defamation per quod.*

We consider next whether, as Royall insists, he pleaded sufficient facts to state a claim that the statements about his sexual orientation were harmful in the circumstances alleged, i.e., defamation per quod. Appellees argue the motion court did not err in dismissing Royall's Amended Complaint because (a) nothing "suggest[s] that the alleged

use of the word 'f*g' to describe Mr. Royall is intended to be a factual statement that Mr. Royall" is "a member of the LGBTQ+ community"; and (b) Royall failed to allege facts with sufficient particularity to plead the economic injury necessary to plead defamation per quod. Although we cannot rule out, at this pleading stage that the challenged statements were intentionally false statements about Royall's sexual orientation, we conclude, that the Amended Complaint does not allege sufficient facts to establish the reputational injury element of Royall's defamation claim, and therefore Royall failed to state a claim against any of the appellees.

### A. The Amended Complaint alleges sufficient facts to establish that Dicks made defamatory statements about Royall's sexual orientation but does not allege sufficient facts to establish Jewell did so.

### 1. The allegations against Dicks are sufficient to plead defamatory statements.

Appellees contend "[t]he alleged publication does not amount to a suggestion of homosexuality" because it was not "a statement of fact," but merely "colorful, hyperbolic language[.]"In their view, "[t]o the extent Mr. Royall bases his claim on Mr. Dicks' perceived labelling of him as a homosexual man," "he is being overly literal in his interpretation of the word used[,]" based on "an outdated notion that being called those terms to indicate a sexual orientation is derogatory." Appellees ask us to recognize instead that even though the pejorative term "fag" allegedly spoken by Dicks "has historically been invoked to describe homosexual men[,]" the mere use of that term "is not sufficient to prove that Mr. Dicks believes that Mr. Royall has sex with men, let alone that he intended to communicate that as fact[,]" given this word, "including its homosexual undertones[,]"

40

more frequently is "deployed . . . to call into question a person's masculinity[,]" rather than "to describe as fact the person's sexual orientation."

In support, Appellees cite to *Theno v. Tongaonoxie Unified Sch. Distr. No. 464*, 377 F. Supp. 2d 952, 964-65 (D. Kan. 2005), and *Schmedding v. Tnemec Co.*, 187 F. 3d 862, 865 (8th Cir. 1999). We find both cases inapposite because the facts, decisions, and rationales do not support the broad proposition advanced by Appellees that homophobic epithets cannot have a defamatory meaning. Neither case involves a defamation claim, and both were decided before employment discrimination based on sexual orientation was recognized as a viable cause of action under Title VII of the 1964 Civil Rights Act, in *Bostock v. Clayton County, Georgia*, 590 U.S. 644, 140 S. Ct. 1731 (2020). Consequently, neither federal court considered whether those alleged campaigns of homophobic statements could be construed as defamatory statements about sexual orientation. Instead, both construed those complaints broadly enough to state a Title VII federal discrimination claim based on sexual discrimination.

Nor does the decision in *Werber v. Klopfer*, 260 Md. 486 (1971)—that the derogatory lampoon in that case was not defamatory as a matter of law—require dismissal of Royall's claims. In contrast to the post-trial review of evidence conducted by the appellate court in that case, we are reviewing these alleged statements in the light most favorable to Royall, as the party opposing dismissal. *See Hollabaugh v. MRO Corp.*, 491 Md. 165, 171 (2025). To be sure, "obscenities, vulgarities, insults, epithets, name-calling, [or] other verbal abuse" may be "obnoxious, insulting, or tasteless[,]" but these are "regarded as a part of life for which the law of defamation affords no remedy." Rodney A.

41

Smolla, 1 *Law of Defamation* § 4:8 (2d ed. & 2025 update). Although we consider it to be a close question whether these particular statements crossed the line from merely odious name-calling or verbal abuse, into false statements of fact that may be actionable as defamation, we will treat that as a factual question that must be resolved in Royall's favor at this pleading stage.[25] That decision reflects our broad reading of his pro se pleadings, including the Amended Complaint, its predecessors, motions papers, and briefing to this Court, which collectively indicate that Royall is alleging that Dicks' statements on these two occasions continued a pattern of defamatory statements about his sexual orientation that began during his employment. Because a reasonable inference from Dicks' repeated descriptions of Royall as a "fag" is that Dicks was again commenting on his sexual orientation, not on his masculinity, we cannot determine from the appellate bench that these statements lacked potential to have defamatory meaning. Although Royall may have alleged enough to plead these statements were defamatory, we explain below that he failed to allege that they caused him the type of actual economic injury that he must plead to state a defamation per quod claim.

### 2. *The allegations against Jewell are not sufficient to plead defamatory statements.*

Although Royall sufficiently alleged Dicks made defamatory statements about his sexual orientation, we agree with the motion court that Royall did not allege sufficient facts

---

[25] We note that Royall's prior versions of his complaint allege that during his employment, appellees were part of an ongoing campaign of denigrating statements about his sexual orientation, which began during his employment but "continued" after he left in 2018, as Dicks and Jewell "continued to make statements during 2021 that [Royall] is gay (homosexual)."

to establish that Jewell adopted Dicks' defamatory statements by means of a single fist pump to the first of them. Even if that one gesture, which Royall alleges was the same one he made when Royall was fired, could be viewed as "sign language" in this context, Royall did not plead sufficient facts to establish it was defamatory in the circumstances he alleges here.

We agree with the motion court that it is simply pleading a "bridge too far" to speculatively stretch the meaning of that single silent and equivocal gesture by Jewell—which Royall does not allege he witnessed—into an affirmative adoption of Dicks' false statement about Royall's sexual orientation. By Royall's own account, Jewell's gesture was a repetition of the same gesture he used when reacting to the termination of Royall's employment three years earlier. Given Royall does not allege Jewell's earlier gesture responded to a false statement about Royall's sexual orientation, we cannot reasonably infer merely repeating the same gesture three years later amounted to Jewell affirmatively adopting Dicks' use of the term "fag" in that moment. It is too remote and too speculative to fill in those blanks in Royall's Amended Complaint. *Cf. Montgomery Investigative Servs., Ltd.*, 173 Md. App. at 217 (recognizing "a defamation—a false accusation of theft—may be published by conduct as surely as by express words"); *Tanner v. Pillsbury Mills*, 281 P.2d 391, 392 (Utah 1955) (holding defendant's "occasional nod of the head, . . . signifying either 'yes' or 'no,' or an 'acquiescence' or a 'disagreement'" with statements being made about the plaintiff was not sufficient to plead defamation because those gestures were "so far removed from the claimed fact, so impotent in establishing a slander, and so closely akin to conjecture as to be worthy of little more than its mention here").

***B. The Amended Complaint does not allege sufficient facts to establish economic injury from Dicks' allegedly false statements about Royall's sexual orientation.***

Because Royall's false statements are not defamatory per se, he had to allege actual reputational injuries resulting in economic loss. *See M & S Furniture*, 249 Md. at 544; *Samuels*, 135 Md. App. at 549-50. Although false statements about sexual orientation could have an adverse economic impact in a range of possible scenarios, none are alleged here.

The Amended Complaint alleges only that as a result of Dicks' post-employment statements about his sexual orientation and Jewell's hand gesture—which he claims occurred on November 21, 2021, more than three years after his employment ended in June 2018—he lost "employment opportunities" and was "scorn[ed]" by former co-workers. With respect to those injuries, he specifically explains that as a result of these statements, he believed he could not seek an employment reference from C&C. This is the sole factual basis proffered by Royall for his claim that false statements about his sexual orientation harmed his employability or otherwise caused economic injury.

Royall's economic harm allegation starkly contrasts with the scenario in *Wetherby*, where the parties stipulated those false statements about the plaintiffs' sexual orientation undisputedly caused the plaintiffs to be denied business insurance. *See* 235 Md. at 239-40. Likewise, in contrast to defamatory statements that impugned a former employee's qualifications to practice law and medicine, respectively litigated in *Shapiro*, 105 Md. App. at 775-77, and *Adventist Healthcare, Inc. v. Behram*, 488 Md. 410, 429 n.13 (2024), Royall

44

failed to allege facts from which a trier of fact could find any employment reference he sought from C&C would include false statements about his sexual orientation.[26]

To be sure, "[s]pecial harm may be a loss of presently existing advantage, as a discharge from employment[,]" or "a failure to realize *a reasonable expectation of gain, as the denial of employment* which, but for the currency of the slander, the plaintiff would have received." Restatement (Second) Torts § 575 (emphasis added). *Cf., e.g.*, *Adventist Healthcare.*, 488 Md. at 429 n.13 (noting hospital did not appeal this Court's holding that doctor stated defamation claim based on hospital's report to national databank regarding disputed circumstances leading to loss of hospital privileges); *King v. U.S. Bank Nat'l Ass'n*, 53 Cal. App. 5th 675, 704 (2020) (affirming defamation judgment based on substantial evidence that employer lacked reasonable grounds to believe truth of defamatory statements that it republished with malice to prospective employers, reporting that former employee falsified reports and employment records).

Although Royall averred in earlier pleadings that he was out of work for over a year after being terminated in June 2018, the statements identified in this complaint occurred in November 2021, so they could not reasonably have induced him to refrain from seeking a reference from C&C during that entire three-year period. In any event, given broad

---

[26] We note Royall suggested elsewhere during this litigation he expected an unfavorable employment reference from C&C because he had a physical altercation with Dicks on the day he was terminated, as memorialized in two workplace incident reports he attached to his brief.

prohibitions against employment discrimination based on sexual orientation,[27] and the lack of any particularized allegations about employment opportunities lost because of these statements by Dicks, the Amended Complaint does not allege sufficient facts to establish Royall had a reasonable belief any employment reference he might have obtained from C&C would include false statements about his sexual orientation. *See Indep. Newspapers, Inc. v. Brodie*, 407 Md. 415, 441 (2009).

Nor did Royall otherwise plead economic injury resulting from the "scorn" of his former co-workers. Because the disputed statements about his sexual orientation were not defamatory per se, he was required to allege "some kind of economic or pecuniary loss[,]" other than "lowered social standing and its purely social consequences[.]" Restatement (Second) Torts § 575 cmt. b. *See M & S Furniture*, 249 Md. at 544. He does not claim that his loss of reputation among former co-workers caused him a "material loss capable of being measured in money" based on "the lowered social standing resulting from the" alleged defamation. *See* Restatement (Second) Torts § 575 cmt. b.

Rather than pleading facts establishing a reasonable expectation that false statements about his sexual orientation would be repeated to prospective employers, Royall simply invokes language from a 33-year-old Missouri decision holding that a false imputation of homosexuality was actionable because "[a]ttitudes change slowly and unevenly among different groups[,]" stating that "[d]espite the efforts of many homosexual groups to foster greater tolerance and acceptance, homosexuality is still viewed with

---

[27] See *supra* note 23.

46

disfavor, if not outright contempt, by a sizeable proportion of our population." *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 312 (Mo. 1993). For the reasons explained, current views in Maryland about sexual orientation and the role of courts in maintaining dignity in the law undercut the persuasive value of the Missouri court's view. *See infra*, Part III.

Because Royall does not plead facts from which a fact-finder could conclude he suffered economic loss from two false statements about his sexual orientation by a former supervisor more than three years after his employment ended, his Amended Complaint does not plead a defamatory injury. Absent "some specific claim of actual harm" to Royall, "he is doing nothing more than trading in the same kinds of stereotypes that recent case law and good sense disparage." *Albright*, 321 F. Supp. 2d at 139. In turn, because the Amended Complaint fails to allege the core reputational injury element of a defamation per quod claim, the motion court did not err in dismissing the Amended Complaint against all three appellees.[28]

## CONCLUSION

We conclude that under Maryland law, a false statement about the sexual orientation of a person who is not a public figure is not defamatory per se, because in our common experience, such statements are not so self-evidently harmful that courts should presume reputational injuries without pleading or proof. In turn, because the statements alleged here,

---

[28] Given these pleading insufficiencies common to all three appellees, we need not address C&C's separate argument that Royall failed to allege facts sufficient to state a vicarious liability claim.

pejoratively calling Royall a "fag[,]" were not defamatory per se, and Royall did not allege facts sufficient to plead defamation per quod, we will affirm the judgment dismissing the Amended Complaint against Dicks, Jewell, and C&C.[29]

**JUDGMENT OF THE CIRCUIT COURT FOR PRINCE GEORGE'S COUNTY AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

[29] Because the judgment of dismissal was "without prejudice, we note "there is no adjudication on the merits and that, therefore, a new suit on the same cause of action is not barred by principles of res judicata[,]" but "might be barred on other grounds, such as limitations." *Moore v. Pomory*, 329 Md. 428, 432 (1993) (cleaned up).